IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In re: | ) | Case No. 23-378-ELG |
| | ) | |
| BROUGHTON CONSTRUCTION CO., LLC | ) | (Chapter 7) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| ————————————————— | ) | |
| | ) | |
| WENDELL WEBSTER, in his official capacity | ) | |
| as chapter 7 trustee and as assignee of Industrial | ) | Adv. Case No. 25-10054-ELG |
| Bank and Nationwide Mutual Insurance Company | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SQUARE FUNDING LLC | ) | |
| d/b/a SQUARE ADVANCE | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| ————————————————— | ) | |
| | ) | |
| WENDELL WEBSTER, in his official capacity | ) | |
| as chapter 7 trustee and as assignee of Industrial | ) | Adv. Case No. 25-10055-ELG |
| Bank and Nationwide Mutual Insurance Company | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CFG MERCHANT SOLUTIONS, LLC | ) | |
| | ) | |
| Defendant. | ) | |
| ————————————————— | ) | |

## MOTION FOR SUMMARY JUDGMENT

Maurice B. VerStandig
Bar No. MD18077
The VerStandig Law Firm, LLC
9812 Falls Road, #114-160
Potomac, Maryland 20854
mac@mbvesq.com
*Counsel for the Plaintiff*

## *Table of Contents*

I.      Introduction.................................................................................................................... 1

II.     Standard ........................................................................................................................ 2

III.    Statement of Material Facts Not Subject to Genuine Dispute ........................................ 3

      a.   Claims Against CFG ............................................................................................ 4

      b.   Claims Against Square ......................................................................................... 6

IV.     Argument: Each MCA Transaction is a Usurious Loan .................................................. 7

      a.   Standard Under New York Law ........................................................................... 8

      b.   The Square Agreements are Loans ...................................................................... 9

            i.    Reconciliation ......................................................................... 10

            ii.   Finite Term .............................................................................. 13

            iii.  Recourse .................................................................................. 13

            iv.   *Shoot the Moon* Factors ......................................................... 16

      c.   The CFG Agreements are Loans .......................................................................... 18

            i.    Reconciliation ......................................................................... 19

            ii.   Finite Term .............................................................................. 20

            iii.  Recourse .................................................................................. 21

            iv.   *Shoot the Moon* Factors ......................................................... 22

V.      Argument: Usurious Loans are Void Under New York Law and Cannot Give Rise to a Finding of Reasonably Equivalent Value ............................................. 25

VI.     Argument: The MCA Transactions Cannot Have Been Sales Without Offending Federal Securities Laws and State Blue Sky Laws ....................................... 29

      a.   One Cannot Sell an Interest in Inchoate Receivables ......................................... 30

      b.   If the MCA Transactions are Sales, the Defendants Committed Securities Fraud ................................................................................................... 32

VII.    Argument: Each MCA Transaction is Avoidable ......................................................... 35

VIII.    Summary Judgment is Also Appropriate on the Claims for Unjust Enrichment ..........................................................................................................38

IX.    Conclusion ..........................................................................................................40

## *Table of Authorities*

**Cases**

*172 Madison (NY) LLC v. NMP-Group, LLC,*
977 N.Y.S.2d 668 (Sup. Ct. N.Y. 2013) ............................................................... 15

*Access Point Fin. v. Everhardt,*
2026 U.S. Dist. LEXIS 93582 (N.D. Ga. Mar. 12, 2026) .......................................... 15

*Adar Bays, LLC v. GeneSYS ID, Inc.,*
179 N.E.3d 612 (N.Y. 2021) ............................................................................ 8, 27

*Affiliated Ute Citizens* v. *United States,*
406 U.S. 128 (1972) ......................................................................................... 34

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986) ........................................................................................... 3

*Associated Indus. Ins. Co. v. Mt. Hawley Ins. Co.,*
2021 WL 1921016 (S.D. Cal. 2021) ....................................................................... 3

*Blackburn v. United States,*
2020 U.S. Dist. LEXIS 167998 (D. Utah July 14, 2020) ............................................ 38

*Blue Chip Stamps* v. *Manor Drug Stores,*
421 U.S. 723 (1975) .......................................................................................... 34

*Cap Call, LLC v. Foster (In re Shoot the Moon, LLC),*
635 B.R. 797 (Bankr. D. Mont. 2021) ............................................................... 8, 9, 23

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986) ............................................................................................ 2

*CFG Merch. Sols., LLC v. Essential Founds. Preschool,*
2025 N.Y. Misc. LEXIS 7754 (Sup. Ct. N.Y. Sep. 19, 2025) ....................................... 18

*Collins v. Kohlbert & Co. (In re Sw. Supermarkets, LLC),*
325 B.R. 417 (Bankr. D. Ariz. 2005) .................................................................... 28

*Crystal Springs Cap., Inc. v. Big Thicket Coin, LLC,*
220 A.D.3d 745 (N.Y. App. Div. 2023) ................................................................. 27

*Diamond v. Atwood,*
43 F.3d 1538 (D.C. Cir. 1995) ............................................................................... 3

*Diaz Vicente v. Obenauer,*
736 F. Supp. 679 (E.D. Va. 1990) ......................................................................... 34

*Ernst & Ernst v. Hochfelder*,
425 U.S. 185 (1976)................................................................................................ 34

*Falconi-Sachs v. LPF Senate Square, LLC*,
142 A.3d 550 (D.C. 2016) ..................................................................................... 38

*Fleetwood Servs., LLC v. Richmond Capital Grp. LLC*,
2023 U.S. App. LEXIS 14241 (2d Cir. June 8, 2023) ....................................... 8, 10, 13

*Folksamerica Reinsurance Co. v. Republic Ins. Co.*,
2004 WL 1043086 (S.D.N.Y. 2004).......................................................................... 3

*Glasgow v. Camanne Mgmt.*,
261 A.3d 208 (D.C. 2021) ..................................................................................... 39

*Gregorio v. Hoover*,
238 F. Supp. 3d 37 (D.D.C. 2017).......................................................................... 38

*Haymount Urgent Care PC v. GoFund Advance, LLC*,
609 F. Supp. 3d 237 (S.D.N.Y. 2022)..................................................................... 27

*Holcomb v. Powell*,
433 F.3d 889 (D.C. Cir. 2006) ................................................................................. 3

*Hulley Enters. v. Baker Botts LLP*,
286 F. Supp. 3d 1 (D.D.C. 2017)............................................................................ 26

*In re Berry*,
2023 Bankr. LEXIS 2602 (Bankr. D.D.C. Oct. 23, 2023)....................................... 38

*In re Colonial Realty, Inc.*,
226 B.R. 513 (Bankr. D. Conn. 1998) .................................................................... 38

*In re Cook*,
322 B.R. 336 (Bankr. N.D. Ohio 2005) .................................................................. 32

*In re Covenant Partners, L.P.*,
541 B.R. 804 (Bankr. E.D. Pa. 2015) ..................................................................... 38

*In re Full Spectrum Mgmt., LLC*,
621 B.R. 421 (Bankr. W.D. Mich. 2020)................................................................. 38

*In re Grand Union Co.*,
219 F. 353 (2d Cir. 1914)....................................................................................... 21

*In re Watchmen Sec. LLC*,
2024 Bankr. LEXIS 2871 (Bankr. S.D. Ind. Nov. 20, 2024) ............................................. 30, 31, 32

*In re Williams Land Clearing, Grading, & Timber Logging, LLC*,
2025 Bankr. LEXIS 1201 (Bankr. E.D.N.C. May 16, 2025) ................................................. 8, 9, 23

*Lend Lease (US) Constr. LMB Inc. v. Zurich Am. Ins. Co.*,
71 N.E.3d 556 (N.Y. 2017) .......................................................................................................... 12

*LG Funding, LLC v. United Senior Props. of Olathe, LLC*,
181 A.D.3d 664 (N.Y. 2d Dep't 2020) ..................................................................................... 8, 15

*Lorenzo v. SEC*,
587 U.S. 71 (2019) ........................................................................................................................ 33

*Luminant Energy Co. LLC v. Koch Energy Servs., LLC*,
551 F. Supp. 3d 373 (S.D.N.Y. 2021) .......................................................................................... 12

*M Design Vill. v. Versant Funding LLC (In re M Design Vill.)*,
2025 Bankr. LEXIS 1778 (Bankr. D.N.J. July 24, 2025) .............................................................. 30

*Marsden v. District of Columbia*,
142 A.3d 525 (D.C. 2016) ............................................................................................................ 39

*Martinez Quality Painting & Drywall v. Newco Capital Grp. VI, LLC*,
2025 Bankr. LEXIS 613 (Bankr. W.D.N.C. Mar. 14, 2025) .................................................... 27, 28

*Matiella v. Murdock St. LLC*,
2025 U.S. Dist. LEXIS 256074 (D.D.C. Dec. 10, 2025) ......................................................... 39, 40

*Matter of Nonhuman Rights Project, Inc. v. Breheny*,
197 N.E.3d 921 (N.Y. 2022) ........................................................................................................ 40

*Mayorga v. Merdon*,
928 F.3d 84 (D.C. Cir. 2019) ......................................................................................................... 3

*McNider Marine, LLC v. Yellowstone Capital, LLC*,
2019 N.Y. Misc. LEXIS 6165 (Sup. Ct. N.Y. Nov. 19, 2019) ...................................................... 12

*News World Comms., Inc. v. Thompson*,
878 A.2d 1218 (D.C. 2005) .......................................................................................................... 38

*O'Donovan v. Galinski*,
62 A.D.3d 769 (N.Y. 2d Dep't 2009) .............................................................................................. 8

*Principis Cap., LLC v. I Do, Inc.*,
201 A.D.3d 752 (N.Y. 2d Dep't 2022) ................................................................... 8

*Ronaldson v. Nat'l Ass'n of Home Builders*,
502 F. Supp. 3d 290 (D.D.C. 2020) ..................................................................... 39

*SEC v. W. J. Howey Co.*,
328 U.S. 293 (1946) ............................................................................................. 33

*Sommers v. Capybara Cap., LLC (In re Anadrill Directional Servs.)*,
2026 Bankr. LEXIS 302 (Bankr. S.D. Tex. Feb. 4, 2026) .................................... 28

*Spig Indus., LLC v. Novac Equities LLC*,
2025 U.S. Dist. LEXIS 208356 (S.D.N.Y. Oct. 22, 2025) .................................... 11

*Square Funding LLC v. Walsh Roofing Servs. of Tampa Bay, LLC*,
2025 N.Y. Misc. LEXIS 737 (Sup. Ct. N.Y. Feb. 11, 2025) .................................. 10

*Superintendent of Insurance* v. *Bankers Life & Cas. Co.*,
404 U.S. 6 (1971) ................................................................................................. 34

*T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*,
809 F.2d 626 (9th Cir. 1987) ................................................................................. 3

*United States v. Resnick*,
2008 U.S. Dist. LEXIS 142273 (N.D. Ill. Sep. 24, 2008) ..................................... 28

*Warfield v. Byron*,
436 F.3d 551 (5th Cir. 2006) ............................................................................... 28

*Welz v. Brown*,
228 A.D.3d 416 (N.Y. App. Div. 2024) ................................................................ 27

*Wyoming Outdoor Council v. Dombeck*,
148 F.Supp.2d 1 (D.D.C. 2001) ............................................................................. 2

**Statutes**
11 U.S.C. § 303 ..................................................................................................... 22

11 U.S.C. § 544 ..................................................................................................... 36

11 U.S.C. § 548 ..................................................................................................... 35

15 U.S.C. § 77b ..................................................................................................... 33

15 U.S.C. § 78c ..................................................................................................... 33

D.C. Code § 28-3104 ............................................................................................ 35, 36

D.C. Code § 28-3105 ................................................................................................ 36

N.Y. Banking Law § 14-a ......................................................................................... 27

N.Y. Gen. Oblig. Law § 5-501 ............................................................................. 26, 27

N.Y. Gen. Oblig. Law § 5-511 ............................................................................. 26, 28

N.Y. Gen. Oblig. Law § 5-521 ................................................................................. 27

N.Y. Penal Law § 190.40 ......................................................................................... 26

**Rules**

Federal Rule of Bankruptcy Procedure 7056 .............................................................. 1, 3

Federal Rule of Civil Procedure 56 ........................................................................... 1, 3

**Treatises**

John F. Hilson & Stephen L. Sepinuck, A "Sale" of Future Receivables: Disguising
A Secured Loan as a Purchase of Hope, 9 Transactional Lawyer 14, 15 (2019) ................... 30, 31

**Regulations**

17 C.F.R. § 240.10b-5 .......................................................................................... 32, 34

### *Table of Exhibits*

A. May 2019 Agreement

B. CFG-000104 through CFG-000122

C. CFG-000123 through CFG-000150

D. January 2023 Agreement

E. June 2022 Agreement

F. September 2022 Agreement

G. December 2022 Agreement

H. SQ-000064 through SQ-000066

I. Walsh Roofing Contract

J. Stipulation of Discontinuance Without Prejudice

K. Expert Report of Lauren P. Berret, JD, CPA (Square)

L. Responses to Requests for Production

M. Requests for Production

N. Loan Application

O. Loan Application of A-Frame Building Consultants

P. E-mail of February 27, 2023

Q. E-mail of March 31, 2023

R. Expert Report of Lauren P. Berret, JD, CPA (CFG)

Comes now Wendell Webster, in his official capacity as trustee (the "Trustee") of the bankruptcy estate of Broughton Construction Co., LLC (the "Estate"), by and through his undersigned special counsel, pursuant to Federal Rule of Bankruptcy Procedure 7056 and Federal Rule of Civil Procedure 56, and moves for entry of summary judgment in favor of the Trustee, and against Square Funding LLC d/b/a Square Advance ("Square") and CFG Merchant Solutions, LLC ("CFG") (Square and CFG being collectively known as the "Defendants," and each a "Defendant"), and in support thereof states as follows:

## I.      Introduction

In the years preceding a bankruptcy filing, Broughton Construction Co., LLC ("Broughton" or the "Debtor") paid $5,058,947.00 to CFG and $1,156,357.86 to Square, pursuant to a series of merchant cash advance transactions (the "MCA Transactions," and each an "MCA Transaction"). Regardless of whether the MCA Transactions are accepted as *bona fide* sales of future receivables, recharacterized as usurious loans, or recharacterized as sales of securities, each constitutes a constructively fraudulent conveyance, entered into for well less than reasonably equivalent value at a time when the Debtor was deeply insolvent and without the funds to pay its debts as they came due. And each MCA Transaction is thusly avoidable under the familiar rigors of title 11 of the United States Code (the "Bankruptcy Code"), as well as under applicable District of Columbia law.

Critically, the outcome of this case is *not* altered by a determination that the MCA Transactions are valid sales, though the Trustee's claim to remedy an unjust enrichment of the Defendants does partially turn on this characterization. To the contrary, whether or not viewed as loans or the sale of securities, all of the arrangements are patently violative of the modern incarnations of the Statute of Elizabeth. And the Estate is thusly entitled to avoid each payment

made to the Defendants, giving rise to a money judgment in the sum of $5,058,947.00 as against

CFG and $1,156,357.86 as against Square.

For these reasons, and as extrapolated upon *infra*, it is respectfully urged that summary

judgment be entered in favor of the Trustee and against the Defendant.

## II.      Standard

The standard for a motion seeking summary judgment is familiarly set forth in the Federal

Rules of Civil Procedure:

> A party may move for summary judgment, identifying each claim or defense--or
> the part of each claim or defense--on which summary judgment is sought. The court
> shall grant summary judgment if the movant shows that there is no genuine dispute
> as to any material fact and the movant is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(a).

As noted by the United States District Court for the District of Columbia, of the rule

governing summary judgment:

> Federal Rule of Civil Procedure 56(c) states that summary judgment is appropriate
> when the pleadings and evidence demonstrate that there is no genuine issue as to
> any material fact and the moving party is entitled to judgment as a matter of law.
> To determine what facts are "material," a court must look to the substantive law on
> which each claim rests. A "genuine issue" is one whose resolution could establish
> an element of a claim or defense and, therefore, affect the outcome of the action.
> In ruling on a motion for summary judgment, the court must draw all justifiable
> inferences in the nonmoving party's favor and accept the nonmoving party's
> evidence as true. All evidence and the inferences drawn therefrom must be
> considered in the light most favorable to the nonmoving party. However, a
> nonmoving party must establish more than "the mere existence of a scintilla of
> evidence" in support of its position. To prevail on a motion for summary judgment,
> the moving party must show that the nonmoving party "fail[ed] to make a showing
> sufficient to establish the existence of an element essential to that party's case, and
> in which that party will bear the ultimate burden of proof at trial." By pointing to
> the absence of evidence proffered by the nonmoving party, a moving party may
> succeed on summary judgment.

*Wyoming Outdoor Council v. Dombeck*, 148 F. Supp. 2d 1, 7 (D.D.C. 2001) (citing Fed. R. Civ.

P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Diamond v. Atwood*, 43 F.3d 1538,

1540 (D.C. Cir. 1995); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); quoting *Anderson*, 477 U.S. at 255; *Celotex*, 477 U.S. at 325).

In the words of the United States Court of Appeals for the District of Columbia Circuit: "A fact is 'material' if a dispute over it might affect the outcome of a suit under governing law; factual disputes that are 'irrelevant or unnecessary' do not affect the summary judgment determination." *Mayorga v. Merdon*, 928 F.3d 84, 89 (D.C. Cir. 2019) (quoting *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006)). *See also Folksamerica Reinsurance Co. v. Republic Ins. Co.*, 2004 WL 1043086, at \*2 (S.D.N.Y. 2004) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude entry of summary judgment."); *Associated Indus. Ins. Co. v. Mt. Hawley Ins. Co.*, 2021 WL 1921016, at \*3 (S.D. Cal. 2021) ("Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.") (quoting *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987)).

### III.    Statement of Material Facts Not Subject to Genuine Dispute

Pursuant to Federal Rule of Civil Procedure 56(c)(1)—as made applicable by Federal Rule of Bankruptcy Procedure 7056—the Trustee asserts the following facts are not subject to reasonable dispute:

1.      The Trustee is the chapter 7 trustee overseeing administration of the Debtor's estate. Pursuant to an agreement dated November 10, 2025, as approved by the United States Bankruptcy Court for the District of Columbia on December 8, 2025, the Trustee is also the assignee of certain causes of action held by Industrial and Nationwide, against Square, *see* Complaint, Case No. 25-10054-ELG at DE #1, at ¶ 7; Answer, Case No. 25-10054-ELG at DE #9, at ¶ 7 (admitting

3

allegation), and against CFG, *see* Complaint, Case No. 25-10055-ELG at DE #1, at ¶ 7; Answer, Case No. 25-10055-ELG  at DE #9, at ¶ 7 (admitting allegation).

### a.  Claims Against CFG

2.      On or about May 13, 2019, the Debtor and CFG entered into an agreement (the "May 2019 Agreement"), whereby the Debtor putatively sold to CFG the sum of $108,000.00 in future receivables and CFG paid to the Debtor the sum of $75,000.00 (less fees of $3,779.00). *See* May 2019 Agreement, attached hereto as Exhibit A.

3.      The Debtor and CFG thereafter entered into thirteen subsequent agreements (for a total of fourteen agreements, including the May 2019 Agreement), with the approximate dates of each such agreement, the invoice number designated by CFG to correlate to each agreement, the total monies provided to the Debtor, the total monies collected by CFG, and the Debtor's total obligation under each agreement, being as follows:

| Date | Invoice | Total Funds to Debtor | Total Paid by Debtor | Total Credit Memo | Total Obligation |
|---|---|---|---|---|---|
| May 14, 2019 | INV12347 | $71,721.00 | $48,977.00 | $59,023.00 | $108,000.00 |
| July 30, 2019 | INV14365 | $102,568.00 | $242,550.00 | $0.00 | $242,550.00 |
| August 30, 2019 | INV15137 | $98,201.00 | $147,000.00 | $0.00 | $147,000.00 |
| January 28, 2020 | INV19014 | $492,500.00 | $675,000.00 | $0.00 | $675,000.00 |
| March 13, 2020 | INV20253 | $148,025.00 | $202,500.00 | $0.00 | $202,500.00 |
| December 31, 2020 | INV24967 | $445,500.00 | $607,500.00 | $0.00 | $607,500.00 |
| April 21, 2021 | INV27546 | $248,500.00 | $337,500.00 | $0.00 | $337,500.00 |
| July 9, 2021 | INV29845 | $495,500.00 | $440,920.00 | $234,080.00 | $675,000.00 |
| November 5, 2021 | INV33604 | $297,000.00 | $290,000.00 | $115,000.00 | $405,000.00 |
| February 5, 2022 | INV36766 | $262,000.00 | $600,000.00 | $100,000.00 | $700,000.00 |
| April 7, 2022 | INV38605 | $182,000.00 | $420,000.00 | $0.00 | $420,000.00 |
| August 2, 2022 | INV43036 | $501,021.00 | $627,000.00 | $220,000.00 | $847,000.00 |
| November 1, 2022 | INV46643 | $296,821.00 | $420,000.00 | $0.00 | $420,000.00 |
| January 19, 2023 | INV49623 | $276,421.00 | $0.00 | $0.00 | $700,000.00 |
| **Total** | | $3,917,778.00 | $5,058,947.00 | $728,103.00 | $6,487,050.00 |

4

*See* CFG-000104 through CFG-000122, attached hereto as Exhibit B; CFG-000123 through CFG-000150, attached hereto as Exhibit C.

4.      Specifically, while copies of certain of the foregoing agreements are no longer in either party's possession, records of outgoing payments to the Debtor (CFG-000123 through CFG-000150), coupled with records from CFG's system for tracking the Debtor's obligations under various "invoice" numbers (CFG-000104 through CFG-000122), create a clear picture through which all data in the foregoing chart may be extracted.

5.      Though the parties are missing copies of several agreements, the first such agreement—the May 2019 Agreement—is part of the record herein, *see* May 2019 Agreement, attached hereto as Exhibit A, as is the final agreement, *see* January 2023 Agreement (the "January 2023 Agreement"), attached hereto as Exhibit D. From those two temporally remote documents, the structure of CFG's form of agreement, at all times relevant, may be distilled, with the relevant provisions (for purposes of this motion) remaining unchanged between the first and last agreements.

6.      Each agreement between the Debtor and CFG is governed by the laws of the State of New York. *See* May 2019 Agreement, attached hereto as Exhibit A, at § 27 ("This Agreement and all acts and transactions hereunder and thereunder and all rights and obligations of Buyer and Seller shall be governed, construed and interpreted in accordance with the internal laws of the State of New York."); January 2023 Agreement, attached hereto as Exhibit D, at § 27 (same).

7.      In sum, the Debtor received—from CFG—the sum of $3,917,778.00, in exchange for which the Debtor putatively "sold" to CFG $6,487,050.00 of future receivables, of which $5,058,947.00 was actually then captured by CFG. *See* CFG-000104 through CFG-000122, attached hereto as Exhibit B; CFG-000123 through CFG-000150, attached hereto as Exhibit C.

**b. Claims Against Square**

8.      On June 14, 2022, the Debtor and Square entered into a Standard Merchant Cash Advance Agreement (the "June 2022 Agreement"), whereby the Debtor putatively sold to Square the sum of $699,500.00 in future receivables, and Square paid the Debtor the sum of $500,000.00 (less fees of $12,500.00). *See* Complaint, Case No. 25-10054-ELG at DE #1, at ¶ 14; Answer, Case No. 25-10054-ELG at DE #9, at ¶ 14 (admitting allegation); June 2022 Agreement, attached hereto as Exhibit E.

9.      The Debtor and Square entered into a subsequent agreement on September 8, 2022 (the "September 2022 Agreement"), in substantially the same form as the June 2022 Agreement, pursuant to which the Debtor putatively sold to Square the sum of $775,500.00 in future receivables, and Square paid the Debtor the sum of $500,000.00 (less $362,250.04, which was used to retire the obligations under the June 2022 Agreement, for which $262,312.47 had been paid to Square at the time the September 2022 Agreement was signed). *See* Complaint, Case No. 25-10054-ELG at DE #1, at ¶ 18; Answer, Case No. 25-10054-ELG at DE #9, at ¶ 18 (admitting allegation); September 2022 Agreement, attached hereto as Exhibit F.

10.      The Debtor and Square entered into a subsequent agreement on December 9, 2022 (the "December 2022 Agreement"), pursuant to which the Debtor putatively sold to Square the sum of $846,000.00 in future receivables, and Square paid the Debtor the sum of $587,500.00, *see* Answer, Case No. 25-10054-ELG at DE #9, at p. 52 (Exhibit C), less $355,437.50, *id.* at pp. 52, 69, which was used to retire the obligations under the September 2022 Agreement, *id. See* December 2022 Agreement, attached hereto as Exhibit G.

11.      Each of the aforesaid MCA Transactions with Square is governed by the laws of the State of New York. *See* Complaint, Case No. 25-10054-ELG at DE #1, at ¶ 16; Answer, Case

6

No. 25-10054-ELG at DE #9, at ¶ 16 (admitting application of New York law); *id.* at pp. 18, 37, 59 (reflecting, in multiple clauses of the agreements attached as exhibits, the application of New York law to each of the three relevant MCA Transactions).

12.     Internal records of Square, produced during discovery, set forth the payment histories for each of the three subject transactions, which are summarized as follows:

| Date | Deal ID | Total Funds to Debtor | Total Paid by Debtor | Total Credit Memo | Total Obligation |
|---|---|---|---|---|---|
| June 14, 2022 | SQ225206 | $487,500.00 | $349,749.96 | $349,750.04 | $699,500.00 |
| September 8, 2022 | SQ225312 | $187,749.96 | $420,062.50 | $355,437.50 | $775,500.00 |
| December 12, 2022 | SQ225419 | $232,062.50 | $386,545.40 | $0.00 | $846,000.00 |
| Total | | $907,312.46 | $1,156,357.86 | $705,187.54 | $2,321,000.00 |

*See* SQ-000064 through SQ-000066, attached hereto as Exhibit H.[1]

13.     In sum, the Debtor received—from Square—the sum of $907,312.46, in exchange for which the Debtor putatively "sold" to Square $2,321,000.00 of future receivables, of which $1,156,357.86 were actually then captured by Square. *Id.*

**IV.     Argument: Each MCA Transaction is a Usurious Loan**

While the Trustee is entitled to prevail *sub judice* without regard to whether the MCA Transactions are loans or legitimate sales agreements, there is still some necessity in making an appropriate determination for purposes of then scrutinizing the applicable elements of the various causes of action (especially the Trustee's claims for unjust enrichment). In light of the nature of

---

[1] Bizarrely, there appears to be a computation error on SQ-000066, with the document showing the Debtor to have "paid" the sum of $422,545.40 but the total sum of the actual payments—when adjusted for returned payments—actually equals $386,545.40. The total payment sum would not be $422,545.40 even without chargebacks (the total would be $486,545.40 if chargebacks were not considered). The Trustee is genuinely not certain of the basis for this discrepancy but is calculating the claim in this case based on the *lower* of the two numbers (*i.e.*, that actually computed based on payment records) and not the larger number (*i.e.*, that manifested from the Defendant's own calculation), even though such ultimately favors Square, not the Trustee.

the agreements themselves, and with the aid of topical case law, it is clear each of the MCA Transactions are loans.

### a. Standard Under New York Law

As noted *supra*, all of the at-issue agreements are governed by New York law. Under that applicable scheme, "'substance—not form—controls' when a court determines whether a transaction is a loan." *Fleetwood Servs., LLC v. Richmond Capital Grp. LLC*, 2023 U.S. App. LEXIS 14241, at *3 (2d Cir. June 8, 2023) (quoting *Adar Bays, LLC v. GeneSYS ID, Inc.*, 179 N.E.3d 612 (N.Y. 2021); citing *O'Donovan v. Galinski*, 62 A.D.3d 769 (N.Y. 2d Dep't 2009)).

Historically, "New York courts usually weigh three factors in making that determination: '(1) whether there is a reconciliation provision in the agreement; (2) whether the agreement has a finite term; and (3) whether there is any recourse should the merchant declare bankruptcy.'" *Fleetwood Servs.*, 2023 U.S. App. LEXIS 14241, at *3 (quoting *Principis Cap., LLC v. I Do, Inc.*, 201 A.D.3d 752 (N.Y. 2d Dep't 2022); citing *LG Funding, LLC v. United Senior Props. of Olathe, LLC*, 181 A.D.3d 664 (N.Y. 2d Dep't 2020)).

More recently, however, courts have begun to look to other factors—including a facial analysis of the economic realities of the at-issue transaction. Specifically, the United States Bankruptcy Court for the Eastern District of North Carolina has applied additional, consistent factors—derivative of a different state's law, but noting such to "overlap"—in assessing whether or not a merchant cash advance agreement is really a loan. *See In re Williams Land Clearing, Grading, & Timber Logging, LLC*, 2025 Bankr. LEXIS 1201, at *23 (Bankr. E.D.N.C. May 16, 2025) (citing *Cap Call, LLC v. Foster (In re Shoot the Moon, LLC)*, 635 B.R. 797, 820 (Bankr. D. Mont. 2021)). Those additional, further consistent factors are:

(1) whether the buyer has a right of recourse against the seller;

8

(2) whether the seller continues to service the accounts and commingles receipts with its operating funds; . . .

(3) whether there was an independent investigation by the buyer of the account debtor;

(4) whether the seller has a right to excess collections;

(5) whether the seller retains an option to repurchase accounts;

(6) whether the buyer can unilaterally alter the pricing terms;

(7) whether the seller has the absolute power to alter or compromise the terms of the underlying asset; and

(8) the language of the agreement and the conduct of the parties.

*In re Williams Land Clearing, Grading, & Timber Logging, LLC*, 2025 Bankr. LEXIS 1201, at *22-23 (quoting *Shoot the Moon*, 635 B.R. at 813).

### b.  The Square Agreements are Loans

Before turning to a factor-specific analysis for Square, it merits notation that barely a year ago, Square pursued collection on an almost-identical agreement with a merchant known as Walsh Roofing Services of Tampa Bay, LLC ("Walsh Roofing"). *Compare* Walsh Roofing Contract, attached hereto as Exhibit I, *with* June 2022 Agreement, attached hereto as Exhibit E; September 2022 Agreement, attached hereto as Exhibit F; December 2022 Agreement, attached hereto as Exhibit G.

When Square then moved for summary judgment—in Square's hand-picked forum of the Supreme Court of New York, in and for Nassau County—an issue immediately arose: the judge overseeing that case *sua sponte* directed a hearing be held, indicating Square would need to therein show:

B) How could the Contract not be deemed a "Predatory Loan Agreement" under which the Plaintiff claims entitlement to $259,225.91 on an initial payment of $142,500.00 within a period of less than one year?

C) How could the Corporate Defendanta,[2] who operate a roofing business, be reasonably expected to pay the minimum payment of $2,735.63 per day?

*Square Funding LLC v. Walsh Roofing Servs. of Tampa Bay, LLC*, 2025 N.Y. Misc. LEXIS 737, at *4-5 (Sup. Ct. N.Y. Feb. 11, 2025).

Rather than endeavor to make these showings, Square dismissed the collection suit fifteen days after issuance of the foregoing order. *See* Stipulation of Discontinuance Without Prejudice, attached hereto as Exhibit J. And such is no doubt unsurprising, given that—as observed *supra*—the order challenging the agreement in *Walsh Roofing* came *sua sponte* from the Defendant's own favored court.

The facts of this case are just as jarring—if not more so—than those of the *Walsh Roofing* case. Here, the June 2022 Agreement provides for repayment in 24 weeks (being a computation of the terms set forth therein). *See* Expert Report of Lauren P. Berret, JD, CPA (the "Berret Square Report"), attached hereto as Exhibit K, at § V. The September 2022 Agreement likewise provides for a 24-week repayment window. *Id.* And the December 2022 Agreement provides for an even shorter repayment period of just 22 weeks. *Id.* Meanwhile, the respective agreements' annualized interest rates—if considered as loans—are 94.2%, 680.4%, and 630.0%. *Id.* at §§ V(A)(4), V(B)(4), V(C)(4).

### i. Reconciliation

Knowing that at least one court has already expressed overt skepticism that Square's agreements are not disguised predatory loans, consideration of the various, non-conjunctive factors falls unsurprisingly into place. The first such inquiry is the presence of a reconciliation provision. *Fleetwood Servs.*, 2023 U.S. App. LEXIS 14241, at *3. Case law, in turn, instructs such is not a

---

[2] [sic].

10

technical assessment of the agreement's bare language but, rather, an analysis of whether utilization of a reconciliation clause is "unavailable in practice." *Spig Indus., LLC v. Novac Equities LLC*, 2025 U.S. Dist. LEXIS 208356, at *42 (S.D.N.Y. Oct. 22, 2025).

The Square agreements in this case do contain reconciliation clauses—sort of. The at-issue agreements provide, *inter alia*:

> Any Merchant may give written notice to SA requesting that SA conduct a reconciliation in order to ensure that the amount that SA has collected equals the Specified Percentage of Merchant(s)'s Receivables under this Agreement. Any Merchant may give written notice requesting a reconciliation. A reconciliation may also be requested by e-mail to info@SAfunding.com and **such notice will be deemed to have been received if and when SA sends a reply e-mail (but not a read receipt)**. If such reconciliation determines that SA collected more than it was entitled to, then SA will credit to the Account all amounts to which SA was not entitled within seven days thereafter. If such reconciliation determines that SA collected less than it was entitled to, then SA will debit from the Account all additional amounts to which SA was entitled within seven days thereafter. In order to effectuate this reconciliation, any Merchant must produce with its request the login and password for the Account and any and all bank statements and merchant statements covering the period from the date of this Agreement through the date of the request for a reconciliation. SA will complete each such reconciliation within two business days after receipt of a written request or one accompanied by the information and documents required for it. Nothing herein limits the amount of times that such a reconciliation may be requested.

June 2022 Agreement, attached hereto as Exhibit E, at § 4 (emphasis added). (The other two agreements contain identical clauses, also in Section 4 thereof.)

The bolded portion of the foregoing provision is critical, insofar as such transmutes an otherwise-plausible reconciliation clause into an illusory reconciliation clause. Square is not required to commence a reconciliation upon receipt of an e-mail request, or even upon sending a "read receipt" for such a request; rather, Square is only obligated to perform a reconciliation within two days of whenever Square deigns to send a reply e-mail.

Under New York law, this is not a reconciliation provision—this is an illusory obligation. *See, e.g.*, *Luminant Energy Co. LLC v. Koch Energy Servs., LLC*, 551 F. Supp. 3d 373, 380

11

(S.D.N.Y. 2021) ("An illusory contract is 'an agreement in which one party gives as consideration a promise that is so insubstantial as to impose no obligation.'") (quoting *Lend Lease (US) Constr. LMB Inc. v. Zurich Am. Ins. Co.*, 71 N.E.3d 556 (N.Y. 2017)). Square is not bound to perform a reconciliation unless and until it responds to a reconciliation request. To the contrary, Square can simply ignore a request—even if a "read receipt" makes clear the request has been received—and carry on without performing a reconciliation. This is a classic hallmark of an illusory reconciliation provision. *See, e.g.*, *McNider Marine, LLC v. Yellowstone Capital, LLC*, 2019 N.Y. Misc. LEXIS 6165, *11 (Sup. Ct. N.Y. Nov. 19, 2019) ("In this case, the court finds that plaintiffs have demonstrated that the reconciliation provisions contained in the addenda to the July and October agreements were illusory. First, the court cannot find from the language in the agreements that Yellowstone had any duty to reconcile. In fact, Yellowstone likely could refuse to even consider reconciliation if it contended that McNider Marine failed to sufficiently document a basis for it. Furthermore, even if Yellowstone was required to reconcile, there was no time to do so because McNider could request reconciliation only within five business days following the end of a calendar month.").

Moreover, even if Square does elect to honor a reconciliation request, the agreement requires the merchant (here, the Debtor) to attach bank statements for the subject period. Yet, such is a practical impossibility unless the reconciliation request pertains to a time period that coincides with the close of a calendar month or, depending on the bank, the close of a statement issuance period. *See McNider Marine*, 2019 N.Y. Misc. LEXIS 6165 at *11. For example, if the Debtor were one week into a month, experienced a dramatic drop in sales, and wished to obtain a reconciliation, the Debtor would not be able to do so for at least another three weeks, as there would not be a bank statement covering the subject period until then. Meanwhile, Square would

12

continue debiting monies from the Debtor's account in the interim—despite the pendency of a putative reconciliation request.[3]

### ii. Finite Term

The second consideration is the existence of a "finite term" in the relevant agreement. Here, each of the three agreements expressly sets forth the amount of money to be remitted each week, *see* June 2022 Agreement, attached hereto as Exhibit E, at p. 1 (preamble), § 3.[4] And insofar as each agreement also specifies the total amount to be repaid, *id.* at p. 1 (preamble), a finite term is necessarily extant: the total monies to be repaid, divided by the weekly remittance sum, equaling the total number of weeks.

True, the weekly sum is stated as a "cap." *Id.* at § 3. Yet, as discussed immediately above, the reconciliation provision through which that sum could be altered is facially illusory. There is no genuine mechanism to reconcile the weekly sum, and, accordingly, no genuine mechanism to alter the finite term of the agreement. Much like a traditional loan, the contract is for a fixed duration.

### iii. Recourse

The third prong is "whether there is any recourse should the merchant declare bankruptcy." *Fleetwood Servs.*, 2023 U.S. App. LEXIS 14241, at *3. Here, there is recourse: the agreements allow for (i) enforcement of a guaranty; (ii) seizure of collateral; (iii) taking possession of the Debtor's premises through assignment of any leases; and (iv) direct seizure of receivables

---

[3] Perhaps tellingly, Square has refused to produce communications with other customers concerning reconciliation requests. *See* Responses to Requests for Production, attached hereto as Exhibit L, at ¶ 13. While not dispositive unto itself (or the Trustee would have moved to compel production), such does speak to Square's uncomfortable position with this factor.

[4] As noted *passim*, all three agreements are substantively identical vis a vis the terms discussed herein, saving and excepting the variables filled into the template form.

from credit card processors otherwise routing monies to the Debtor *See* June 2022 Agreement, attached hereto as Exhibit E, at § 17(f).

To be sure, the applicability of these forms of recourse to a bankruptcy filing is not immediately apparent. Indeed, the agreement only uses the phraseology of "bankruptcy" in connection with a warranty that the Debtor is not contemplating—or already the subject of—a bankruptcy filing. *Id.* at § 28. But the conditions precedent to exercise of the foregoing remedies are conditions that naturally occur upon the filing of a bankruptcy case.

Specifically, the Debtor is in default—and those notably harsh remedies thusly become available to Square—if the Debtor:

> . . . interrupts the operation of its business (other than adverse weather, natural disasters, or acts of God) or transfers, moves, sells, disposes, or otherwise conveys its business or assets without (i) the express prior written consent of SA and (ii) the written agreement of any purchaser or transferee to the assumption of all of any Merchant's obligations under this Agreement pursuant to documentation satisfactory to SA.

*Id.* at § 17(d).

A chapter 7 filing (as happened here) is, of course, an interruption of a business' operations. And any variety of a bankruptcy filing constitutes a "transfer[]" of "assets," insofar as a bankruptcy estate is created. *See* 11 U.S.C. § 541(a). Moreover, the agreements also consider a default to have occurred—and the foregoing remedies to be available—if the Debtor changes bank accounts without providing Square with login information for the new account. *See* June 2022 Agreement, attached hereto as Exhibit E, at § 34(2-3). The same is true if any action is taken to prevent Square from debiting receivables. *Id.* at § 34(6). Yet, the opening of a debtor-in-possession bank account by a chapter 11 debtor would trigger each of these provisions, despite being mandated—for debtors of a certain size—by the Bankruptcy Code. *See* 11 U.S.C. § 345(b). The same would be true of a chapter 7 trustee placing monies in a trustee's account. *Id.*

14

Notably, the agreement both (i) exempts certain activities from the scope of business interruptions (*force majeure*), *see* June 2022 Agreement, attached hereto as Exhibit E, at § 17(d) and (ii) acknowledges the existence of bankruptcy law, *id.* at § 28. Yet, the agreement does not provide for a bankruptcy exception to the default provisions that would necessarily be triggered by a bankruptcy filing. And, lest the retort be that such provisions could never be enforced due to the well-established law governing *ipso facto* provisions, it bears notation that one of the avenues of recourse is enforcement of a guaranty, *id.* at § 17(f), something that is notably not within the protective ambit of the Bankruptcy Code or the automatic stay provided for therein, *see Access Point Fin. v. Everhardt,* 2026 U.S. Dist. LEXIS 93582, at *14 (N.D. Ga. Mar. 12, 2026) (awarding summary judgment on a guaranty claim that triggered upon a bankruptcy filing); *172 Madison (NY) LLC v. NMP-Group, LLC*, 977 N.Y.S.2d 668, 668 (Sup. Ct. N.Y. 2013) ("In sum, as a result of Borrower's voluntary bankruptcy filing (accomplished, of course, with Pirogova's full knowledge and consent) Pirogova is liable for the entirety of all sums due to Lender with respect to the loan.") (internal citation omitted).

Moreover, case law establishes that where a bankruptcy filing triggers a personal guaranty, such is demonstrative of the putative "buyer" not actually bearing the risks of a bankruptcy filing. *See, e.g., LG Funding*, 181 A.D.3d at 666 ("The agreement provides that in the event United files for bankruptcy or is placed under an involuntary filing, the plaintiff would be entitled to enforce the provisions of the personal guaranty executed by Julian and Thoma, United would be required to deliver to the plaintiff a confession of judgment in the amount of the purchased amount, and the plaintiff would be allowed to enter the confession of judgment as a judgment. These provisions suggest that the plaintiff did not assume the risk that United would have less-than-expected or no revenues.").

Discussion is also warranted of one of the agreement's most chutzpah-laden provisions: "Each Merchant is required to give SA written notice at least one day prior to any filing under Title 11 of the United States Code." June 2022 Agreement, attached hereto as Exhibit E, at § 36. Or, stated otherwise, if the Debtor were to contemplate filing for bankruptcy (something that, as discussed above, would trigger myriad defaults as a matter of law), Square must be provided with one day's advanced notice so that remedies may be exercised *before* the protections of the Bankruptcy Code are in place. Given that one of those remedies is, quite literally, seizing the Debtor's place of business and becoming an assignee of the lease, this provision runs the risk of materially frustrating any reorganizational efforts that might ensue.

With the reconciliation clause being illusory, the temporal span of the agreement fixed, and guaranty-centric recourse available in the event of bankruptcy, all three "traditional" factors certainly tip in favor of characterizing the parties' dealings as being those of lender and borrower. An examination of the eight additional criteria—as suggested by the *Shoot the Moon* Court—only reinforces this reality.

### iv.   *Shoot the Moon* Factors

The first *Shoot the Moon* consideration is "whether the buyer has a right of recourse against the seller." Admittedly, this is the one factor—among the myriad non-conjunctive criteria—that could arguably tip either way. While there are strenuous default penalties (as discussed above), those are only invoked in the event of a default. Yet the illusory reconciliation provision again comes into play here: since there is no assured mechanism for reconciling the amount to be tendered, and since Square is able to auto-debit payments, the reality is that there *is* recourse against the seller (*i.e.*, the Debtor)—Square can continue to collect on the disguised loan, regardless of any drop in receivables that may actually occur.

16

The second *Shoot the Moon* criterion is "whether the seller continues to service the accounts and commingles receipts with its operating funds." Unlike a traditional factoring arrangement, such is absolutely true here. The agreements are designed to sweep monies directly from the Debtor's accounts—not to collect monies directly from the Debtor's business counterparties.

The next inquiry is "whether there was an independent investigation by the buyer of the account debtor." The Trustee has requested all communications between the parties, as well as all documents bearing the name of the Debtor, through discovery. See Requests for Production, attached hereto as Exhibit M, at ¶¶ 8-9. Not a single document has been produced evidencing an independent investigation.

In considering "whether the seller has a right to excess collections," the answer is clearly affirmative. This is not a factoring arrangement in which a windfall in purchased receivables would benefit the factoring entity; rather, this is a disguised loan where the same amount of money is due and owing to Square regardless of how much—or how little—is actually collected.

The next factor is "whether the seller retains an option to repurchase accounts." The agreements do not provide the Debtor with any such option.

Similarly, in assessing "whether the buyer can unilaterally alter the pricing terms," the agreements do not appear to provide any such mechanism.

The seventh consideration is "whether the seller has the absolute power to alter or compromise the terms of the underlying asset." This is a little odd since—as discussed *infra*—what is being sold is not truly an asset. While the Debtor retains the ability to conduct business and collect as it sees fit, it also has the ability to negotiate down the size of payments on receivables—something foreign to the world of factoring but common in the world of lending.

17

Finally, in terms of "the language of the agreement and the conduct of the parties," there is every outward appearance of this being a lending transaction. And perhaps the best indicator of such is the two refinancings that occurred between the parties, where monies were withheld from disbursements to the Debtor in the latter two agreements, yet larger receivables sums were sold. If receivables had truly been sold through the June 2022 Agreement, those receivables would belong to Square and be Square's to collect. Yet Square behaved in a directly contradictory manner by refinancing the obligation—allowing the "new" sale of receivables to satisfy the Debtor's obligations on the already-extant sale of receivables. Such is not a cogent or legally-viable position in a sale transaction; short of Square selling the receivables back to the Debtor and then immediately repurchasing them (which is not what the documents provide and which would be Kafkaesque in any event), the two subsequent refinancings do not make any logical or legal sense if considered as purchase agreements. To the contrary, these transactions only make sense if treated as loans refinancing outstanding debts from prior agreements.

### c.  The CFG Agreements are Loans

While CFG—unlike Square—has prevailed upon its favored county courts in New York that its business involves honest purchase agreements rather than usurious loans,[5] a plain examination in this case reveals much to the contrary. CFG's standard form of agreement, as propagated to the Debtor, is every bit as predatory and counter-lawful as is Square's standardized agreement.

---

[5] Notably, it appears CFG—in prevailing in its "home" court—has relied, at least of late, on a different form of agreement than the one at issue *sub judice*, with the reconciliation provisions being materially altered. *See CFG Merch. Sols., LLC v. Essential Founds. Preschool*, 2025 N.Y. Misc. LEXIS 7754, 8 (Sup. Ct. N.Y. Sep. 19, 2025). Equally notably, however, none of the New York state court cases involving CFG are binding upon this Honorable Court, insofar as (i) none are the precedent of the United States Court of Appeals for the District of Columbia Circuit; and (ii) none involved the Debtor.

### i. Reconciliation

Much like Square, CFG does furnish a reconciliation provision. However, also as with Square, the contractual clause is illusory in nature:

> The initial Daily Amount is intended to represent the specified Purchased Percentage of Seller's daily Future Receipts. For as long as no Event of Default has occurred, once each calendar month, Seller may request that Buyer adjust the Daily Amount to more closely reflect the Seller's actual Future Receipts times the specified Purchased Percentage. Seller agrees to provide Buyer any information requested by Buyer to assist in this reconciliation. Upon reasonable verification of such information, Buyer shall adjust the Daily Amount on a going-forward basis to more closely reflect the Seller's actual Future Receipts times the specified Purchased Percentage. Buyer will give Seller notice five business days prior to any such adjustment. After each adjustment made pursuant to this paragraph, the new dollar amount shall be deemed the Daily Amount until any subsequent adjustment.

January 2023 Agreement, attached hereto as Exhibit D, at § 8.

As a starting point, the foregoing clause only allows for reconciliation "once each calendar month," *id.* Yet the same agreement provides for CFG to debit monies on a daily or weekly basis. *Id.* at § 2 ("Buyer will be entitled to collect on a daily basis the cash attributable to the Daily Amount of the Future Receipts as specified in the Schedule of Purchased Receipts. . . Seller understands that this authorization is a fundamental condition to induce Buyer to enter into this Agreement. Buyer and Seller agree that collection frequency of the Daily Amount shall be on a weekly basis, with each weekly collection to equal 5 times the Daily Amount (representing a 5 business day week); provided, however, that upon any breach or default of this Agreement by Seller, Buyer, at Buyer's sole option and without prior notice, may change the collection frequency to daily collection of the Daily Amount, in addition to any and all other rights and remedies Buyer may have under this Agreement, at law, or in equity."). Thus, if the Debtor were to elect reconciliation on the second day of a given month and then experience a dramatic drop in receipts one week later, the Debtor would be thoroughly without recourse until at least three weeks of wrongfully-computed monies have been pilfered by CFG.

19

Moreover, the reconciliation language—much as with Square—is ultimately discretionary in nature, with all such discretion being in the hands of CFG. Not only is the clause utterly devoid of a compulsory timeline for CFG to respond to a reconciliation request, but even when reconciliation is appropriate, CFG is bound only to ". . . adjust the Daily Amount on a going-forward basis to more closely reflect the Seller's actual Future Receipts times the specified Purchased Percentage." January 2023 Agreement, attached hereto as Exhibit D, at § 8. The requirement is not that the sum be adjusted to a point of accuracy, or even that the sum be adjusted within $100.00 of a point of accuracy. The rigor, rather, is merely that the sum be adjusted to "more closely reflect" the actual number. A decrease of $10.00 would satisfy this rigor even if the Debtor's receivables dropped by 95%—after all, a daily remittance reduced by $10.00 does "more closely reflect" an actual percentage of the Debtor's decreased receipts than a daily remittance that is not reduced by $10.00.

### ii.  Finite Term

For the same reasons the Square agreements have a finite term, *see, supra,* § IV(b)(ii), so too do the CFG agreements. With the reconciliation provision proving illusory, the total sum due to CFG under each agreement, divided by the "weekly amount" specified therein, invites a precise calculation of the agreement's duration. *See, e.g.*, January 2023 Agreement, attached hereto as Exhibit D, at p. 1 (identifying key terms); § 2 (addressing collection regiment).

To be sure, the fact that an obligation may not actually be paid within the specified timeframe is not determinative here. Just as traditional loans with maturity dates are subject to extension and forbearance agreements, the agreements with CFG are also subject to potential alteration. The elemental inquiry is not when payment will actually be received; rather, the inquiry is derivative from the fact that a genuine sale of future receivables is necessarily temporally

20

amorphous (as any factor can readily attest), whereas a traditional loan is made on temporally finite terms (as any bank, pawnbroker, or hard money lender can readily attest). *See, e.g.*, *In re Grand Union Co.*, 219 F. 353, 356 (2d Cir. 1914) ("A loan of money is a contract by which one delivers a sum of money to another and the latter agrees to return at a future time a sum equivalent to that which he borrow[s].").

### iii.  Recourse

While CFG endeavors—mightily—to cast its form of agreement as one where there is no recourse in the event of a failure to remit funds, such is an ultimately fantastical construction of the document. In reality, if any seller (*i.e.*, borrower) experiences economic distress, such distress will necessarily trigger a default, which in turn invites recourse for non-payment.

The standardized CFG agreement contains myriad representations and warranties on the part of the seller/borrower. These include, *inter alia*:

> k. Seller shall not sell, dispose, convey or otherwise transfer its business or assets without the express prior written consent of Buyer and the assumption of all of Seller's obligations under this Agreement by the purchaser or transferee of the business or assets pursuant to documentation reasonably satisfactory to Buyer. . .
>
> r. There are no pending lawsuits and/or claims against Seller. . .
>
> t. Seller is not presently intending to file bankruptcy in the foreseeable future. . .

January 2023 Agreement, attached hereto as Exhibit D, at § 4.

Critically, each of the foregoing are *ongoing* covenants, being made applicable ". . . at all times during the course of this Agreement." *Id.* And the violation of any of these covenants (which, again, run for the full duration of the agreement, as opposed to being measures of a static moment in time) is, in turn, an event of default. *Id.* at § 13 ("A 'Default' under this Agreement shall include, but not be limited to, any of the following events: . . . (b) the breach by Seller of any covenants, terms or conditions contained in this Agreement; (c) any representation or warranty made by the

21

Seller in this Agreement or Seller's application for this Agreement is incorrect, false or misleading. . .").

Thus, the mere formation of an *intent* to file for bankruptcy protection constitutes an event of default under the CFG agreement. And, since a borrower necessarily must form such *intent* before seeking bankruptcy relief (absent an involuntary proceeding being initiated, *see* 11 U.S.C. § 303), every bankruptcy-destined borrower of CFG is in default before ever docketing a petition for relief. Such a default, in turn, gives CFG recourse in the form of (i) a personal guaranty, *id.* at § 14(a); (ii) the right to accelerate and collect the full debt, *id.* at § 14(c); and (iii) the right to collect a default fee, *id.* at § 15.

It also bears notation that the mere selling of assets is, too, an event of default. January 2023 Agreement, attached hereto as Exhibit D, at § 4(k). The standard CFG agreement is notably devoid of a typical "ordinary course" savings provision, whereby a sale of assets in the ordinary course of business is not swept into this broad prohibition. Thus, for a merchant in the business of selling goods (which, titularly, would seem awfully close to the very definition of "merchant"), an event of default is bound to occur upon the mere transaction of business, with that event of default, in turn, giving rise to recourse in favor of CFG.[6]

### iv. *Shoot the Moon* Factors

Turning to the *Shoot the Moon* factors, the first such criterion is handily addressed for the reasons discussed immediately above: CFG has recourse against the Debtor, as the various events

---

[6] The oddity—and utterly predatory nature—of this clause cannot be understated. The CFG agreement was drafted by someone familiar with the verbiage (and concept of) "ordinary course of business," insofar as the term (or the slightly altered "ordinary course of Seller's business") is used therein numerous times. *See id.* at §§ 1, 4(p), 4(u), 7. Two of those uses are even in the representations and warranties provision of the agreement. *Id.* at §§ 4(p), 4(u). Yet CFG does *not* use the verbiage when discussing a sale of assets as an event of default. *Id.* at § 4(k).

22

of default include not merely the contemplation of bankruptcy but, too, the mere carrying on of a business in which assets are sold.

The second rigor is, too, satisfied: the Debtor continued to service its own accounts and commingle receipts, with CFG merely debiting a portion thereof. There is no segregated account into which CFG's "acquired" monies were to flow. In fact, the CFG agreement prohibits the use of a segregated account. *See* January 2023 Agreement, attached hereto as Exhibit D, at § 4(e).

The record is silent as to the existence, *vel non*, of an "independent investigation by the buyer of the account debtor." *In re Williams Land Clearing, Grading, & Timber Logging, LLC*, 2025 Bankr. LEXIS 1201, at *22-23 (quoting *Shoot the Moon*, 635 B.R. at 813). However, such silence may be the precise point: in discovery, CFG produced 761 pages of Bates-stamped documents and approximately 9,378 additional pages of e-mails and attachments thereto. None of these documents appear to evidence an "independent investigation." In fact, the only inquiry into the Debtor's financial wherewithal seems to concern an application, made through a third-party broker, for purposes of "deciding to grant or continue credit to the Applicant." *See* Loan Application, attached hereto as Exhibit N, at p. 2. This application mirrors, closely, that of another borrower of CFG, who submitted a form releasing information "for the purpose of extending credit," and authorizing a further release of information to "any other non-related potential lending sources for consideration of approval of credit." *See* Loan Application of A-Frame Building Consultants, attached hereto as Exhibit O.

So, to whatever extent there was an "independent" investigation (which does not appear to be the case), such was in connection with the extension of "credit" as part of a loan application process. If CFG is to contend such is not indicative of the at-issue transaction being a loan, the Trustee very much looks forward to seeing how such an argument is constructed.

23

The next *Shoot the Moon* consideration is "whether the seller has a right to excess collections." This is answered in the affirmative: CFG does not benefit from—or suffer as a result of—excess collections. Unlike a factoring agreement, where excess collections would be a boon to the factor, the CFG agreements are each singularly focused upon the payment of a sum certain.

The next factor is "whether the seller retains an option to repurchase accounts." This is expressly prohibited by CFG. *See* January 2023 Agreement, attached hereto as Exhibit D, at § 1 ("Seller acknowledges that it has no right to repurchase the Amount Sold from Buyer.").

Similarly, in assessing "whether the buyer can unilaterally alter the pricing terms," the CFG agreement does not provide any such mechanism.

The seventh consideration is "whether the seller has the absolute power to alter or compromise the terms of the underlying asset." As with Square, there are some oddities here, insofar—as discussed *infra*—what is being sold is not truly an asset. Relevantly, though: the Debtor maintains the ability to conduct business and collect as it sees fit. And, as such, the Debtor has the ability to negotiate down the size of payments on receivables—something foreign to the world of factoring but common in the world of lending.

Finally, in terms of "the language of the agreement and the conduct of the parties," there is every outward appearance of this being a lending transaction. Even setting aside the refinancings that occurred (which, as with Square, are strong indicia of traditional lending), the conduct of the parties alone makes this abundantly clear. When the Debtor encountered financial difficulty, CFG did not endeavor to reconcile the daily or weekly amount. Rather, CFG approached the Debtor as a lender would approach a borrower:

Casey,

I just wanted to touch base.

I need to get something set up shortly.

24

If we can do 10k/week for the next 3 weeks and then take the 4th and 5th weeks off for march. I would rather get these 3 weeks in the beginning of the month so I can keep you out of default and guarantee its in good standing early without my management asking me questions. . .

E-mail of February 27, 2023, attached hereto as Exhibit P, at p. 2.

On another occasion, CFG's employee (who, by all appearances, seems to be the functional equivalent of a loan officer), wrote, *inter alia*, "I honestly need 30k to settle for the month. Please keep me updated." E-mail of March 31, 2023, attached hereto as Exhibit Q, at p. 4. Yet such is not nearly as telling as when, just nine days earlier, the same CFG employee wrote, *inter alia*:

Casey,

I stopped the debit for two weeks like I said I would in the previous emails.

I would possibly need to raise the debit up to 15k/week to make sure we get in good standing in April quicker and give you the flexibility for a week or two off again after.

*Id.* at pp. 7-8.

If this were a sale of receivables, the questions would focused on how much revenue is being realized and how best to reconcile weekly debits against the agreed-upon sales percentage. But this never was a sale of receivables; this was a loan. And so, a *de facto* loan officer is writing to the Debtor's principal, when finances turn tight, indicating that the weekly debit will need to be *raised* to make up for prior shortfalls. Such is many things; "breathtaking" is one such thing, but "indicia of a sale of receivables" is most certainly not.

V.    **Argument: Usurious Loans are Void Under New York Law and Cannot Give Rise to a Finding of Reasonably Equivalent Value**

Assuming—as urged *supra*—each transaction is a loan forbade by the usury laws of the State of New York, each transaction is accordingly avoidable as a fraudulent conveyance. While merchant cash advance entities (like both Defendants herein) seemingly fetishize the notation that criminal usury is an affirmative defense and not an actual cause of action, Square and CFG both

25

seemingly overlook the fact that usurious loans are void *ab initio* under the *civil* laws of the State of New York—and such need not be raised through an affirmative defense.

New York has multiple usury laws. One is a part of the Empire State's penal code. *See* N.Y. Penal Law § 190.40 (making it a class E felony to charge a rate of interest in excess of 25% per annum). This speaks volumes to the criminality of the Defendants and may be highly relevant to other facets of this case (including the issuance of trial subpoenas seeking pre-suit attorney/client communications, should summary judgment not be granted, insofar as the Defendants' business model falls squarely within the felonious realm of usury, *see Hulley Enters. v. Baker Botts LLP*, 286 F. Supp. 3d 1, 10 (D.D.C. 2017)). Yet, the Trustee agrees that this particular statute is not, unto itself, the optimal foundation for the voiding of the transactions.

Another New York usury law, however, is custom tailored for precisely this circumstance, with the state's general (*i.e.*, non-penal) statutory scheme providing, *inter alia*:

> All bonds, bills, notes, assurances, conveyances, all other contracts or securities whatsoever, except bottomry and respondentia bonds and contracts, and all deposits of goods or other things whatsoever, whereupon or whereby there shall be reserved or taken, or secured or agreed to be reserved or taken, any greater sum, or greater value, for the loan or forbearance of any money, goods or other things in action, than is prescribed in section 5-501, shall be void. . .

N.Y. Gen. Oblig. Law § 5-511(1).

The internal reference to "section 5-501" is, of course, essential to establishing precisely what is being forbidden in this statute: usury. *See* N.Y. Gen. Oblig. Law § 5-501 ("The rate of interest, as computed pursuant to this title, upon the loan or forbearance of any money, goods, or things in action, except as provided in subdivisions five and six of this section or as otherwise provided by law, shall be six per centum per annum unless a different rate is prescribed in section

fourteen-a of the banking law.). *See also* N.Y. Banking Law § 14-a (fixing the rate of usury, for purposes of section 5-501, at "sixteen per centum per annum").[7]

Oddly, corporations may not be permitted to raise *civil* usury as an affirmative defense. N.Y. Gen. Oblig. Law § 5-521(1) ("No corporation shall hereafter interpose the defense of usury in any action."). But such ultimately creates a unique prism whereby a corporate entity (i) may not raise *criminal* usury as a direct cause of action, *see Martinez Quality Painting & Drywall v. Newco Capital Grp. VI, LLC (In re Martinez Quality Painting & Drywall)*, 2025 Bankr. LEXIS 613, at *20 (Bankr. W.D.N.C. Mar. 14, 2025) ("Corporations may only use the Criminal Usury Statute as a shield, not as a sword."); and (ii) may not raise *civil* usury as an affirmative defense, *see*  N.Y. Gen. Oblig. Law § 5-521(1); *but* (iii) may raise criminal usury as an affirmative defense, *see Haymount Urgent Care PC v. GoFund Advance, LLC*, 609 F. Supp. 3d 237, 254 (S.D.N.Y. 2022); and (iv) may raise civil usury as a direct basis to establish an obligation is void *ab initio*, *see Martinez Quality Painting & Drywall*, 2025 Bankr. LEXIS 613, at *23 ("While corporations may not 'interpose the defense of [civil] usury in any action,' '[t]he legislature provided no exceptions to the voiding of usurious loans if the borrower is a corporation.'") (quoting N.Y. Gen. Oblig. Law § 5-521(1); *Adar Bays, LLC v. GeneSYS ID, Inc.*, 179 N.E.3d 612 (N.Y. 2021); citing *Crystal Springs Cap., Inc. v. Big Thicket Coin, LLC*, 220 A.D.3d 745, 746 (N.Y. App. Div. 2023); *Welz v. Brown*, 228 A.D.3d 416, 417 (N.Y. App. Div. 2024)).

Thus, New York law—established through the non-penal provisions of the state's general obligations statutes and banking laws—forbids loans charging a rate of interest in excess of 16%

---

[7] The interplay of N.Y. Gen. Oblig. Law § 5-501 and N.Y. Banking Law § 14-a is a little clunky. Suffice it to posit, the rate of interest established in the latter statute overrides the rate of interest codified in the former statute, for purposes of fixing the rate of civil usury. So the New York civil usury rate is 16% per annum, *not* 6% per annum.

per annum. Since these statutes are *not* part of the penal scheme that may only be raised through an affirmative defense, these statutes do give rise to a direct claim to establish the voidness and nullity of a usurious loan. And since the question is one of civil—not criminal—law, the applicable rate of usury is 16% per annum.

Every single MCA Transaction at issue in this case, viewed as a disguised loan, charges an interest rate well in excess of 16% per annum. *See* Berret Square Report, attached hereto as Exhibit K, at §§ V(A)(4) (94.2%), V(B)(4) (680.4%), V(C)(4) (630.0%); Expert Report of Lauren P. Berret, JD, CPA (the "Berret CFG Report"), attached hereto as Exhibit R, at §§ V(A)(4) (143.3%), V(B)(4) (161.1%), V(C)(4) (217.4%), V(D)(4) (207.5%). A plain review of each obligation confirms as much. *See, supra,* § III.

All of which leads to the simple—and wholly predictable—reality that each of the MCA Transactions are void *ab initio*. *See, e.g.*, N.Y. Gen. Oblig. Law § 5-511(1) (noting civilly usurious loans "shall be void"). And where an obligation is void, the obligation is necessarily one devoid of reasonably equivalent value since there is no transaction left with which to instill value of any equivalence (much less reasonable equivalence). *See Sommers v. Capybara Cap., LLC (In re Anadrill Directional Servs.)*, 2026 Bankr. LEXIS 302, at *24 (Bankr. S.D. Tex. Feb. 4, 2026); *Martinez Quality Painting & Drywall*, 2025 Bankr. LEXIS 613, at *23. *Cf. United States v. Resnick*, 2008 U.S. Dist. LEXIS 142273, at *15 (N.D. Ill. Sep. 24, 2008) ("The unsanctioned gambling contract between Poeta and Resnick is illegal and unenforceable under Illinois law. An illegal contract is void of consideration and not regarded as providing reasonably equivalent value.") (citing *Warfield v. Byron*, 436 F.3d 551, 560 (5th Cir. 2006)); *Collins v. Kohlbert & Co. (In re Sw. Supermarkets, LLC)*, 325 B.R. 417, 431 (Bankr. D. Ariz. 2005) ("Obviously if the

underlying contracts are avoidable as fraudulent transfers, then the Debtor did not receive reasonably equivalent value by satisfying an obligation that is void or voidable.").[8]

To be sure, and as discussed in greater detail below, all of the MCA Transactions lack reasonably equivalent value regardless of whether or not they are formally deemed void on the basis of usury. Somewhat facially, the sums of money bartered are so wantonly disparate as to necessarily lack reasonably equivalent value, and such is well expounded upon by the Trustee's expert witness. But if the transactions are understood to be loans and not true sales, this is both the beginning and end of the analysis: a contract void for usury is, as a matter of law, one devoid of reasonably equivalent value.

## VI.   Argument: The MCA Transactions Cannot Have Been Sales Without Offending Federal Securities Laws and State Blue Sky Laws

There is an additional reason the MCA Transactions must be treated as loans and cannot be considered sales: the "sale" suggested by the Defendant is a legal impossibility. While a merchant assuredly *can* factor identifiable receivables to a third party, a merchant *cannot* sell thoroughly unidentifiable, inchoate future receipts. Such a transaction is not a sale cognizable at law; rather, such a transaction constitutes the bartering of a security. And, for reasons discussed below, the Defendants are assuredly not in a position to argue that the MCA Transactions were actually the issuance of an options contract or the sale of equity in the Debtor.

---

[8] *Collins* is a factually unique case that is cited herein not to show that a fraudulent transfer lacks reasonably equivalent value (such would seem a chicken swallowing an egg) but, rather, to show that a void transaction is necessarily sans reasonably equivalent value. That the transaction in *Collins* happens to be one voided on account of being a fraudulent conveyance is something of a coincidence for purposes of making this point.

### a.  One Cannot Sell an Interest in Inchoate Receivables

The entire notion of a merchant cash advance being a sale is a legal impossibility. Unlike factoring entities, which purchase defined and extant receivables, MCA entities—such as the Defendants—propagate a fiction in which yet-to-be-originated receivables are sold through a bundled transaction. The law neither tolerates nor condones this fiction: one can sell the right to collect a receivable already in existence, but one cannot sell the right to collect receivables that are as-yet little more than fairy dust.

Just last year, the United States Bankruptcy Court for the District of New Jersey was confronted with a debtor suing a merchant cash advance entity for, *inter alia*, a declaration the at-issue transaction was a loan and not a true sale of future receivables. *M Design Vill. v. Versant Funding LLC (In re M Design Vill.)*, 2025 Bankr. LEXIS 1778, at *12 (Bankr. D.N.J. July 24, 2025). In analyzing the analogous framework of the agreement at issue in that case, the *M Design* Court held:

> . . . a putative present sale of rights to payment that do not yet exist . . . is both a metaphysical and legal impossibility. . . . A transfer of future rights to payment—that is, rights that as yet do not exist—cannot occur unless and until the rights to payment arise.

*Id.* at *19 (quoting *In re Watchmen Sec. LLC*, 2024 Bankr. LEXIS 2871 (Bankr. S.D. Ind. Nov. 20, 2024) (quoting John F. Hilson & Stephen L. Sepinuck, A "Sale" of Future Receivables: Disguising A Secured Loan as a Purchase of Hope, 9 Transactional Lawyer 14, 15 (2019))).

Indeed, as expounded upon by the *Watchmen* Court—quoting Messrs. Hilson and Sepinuck—there is a core reason for this impossibility:

> It is simply incoherent to assert that a putative buyer has purchased rights to payment that do not exist at the time of the transaction and that may never exist. The buyer's property interest arises, if at all, when the seller first obtains an interest in the applicable right to payment.

*Watchmen Sec*, 2024 Bankr. LEXIS 2871 at *11 (quoting Hilson & Sepinuck, A "Sale" of Future Receivables, 9 Transactional Lawyer at 15).

To be sure, and as discussed below, an entity *can* purchase an interest in a company's future gross (or net) revenues. Such is fully accomplishable through the sale of a security, whether in the form of equity or even an investment contract. But such is not what the Defendants feign to have accomplished *sub judice*. Square and CFG, rather, urge that they have purchased rights to payments that did not exist at the time of the respective sales:

> Seller agrees to sell to Buyer, in consideration of the Purchase Price as specified in the Schedule of Purchased Receipts, the Amount Sold, by delivering the Purchased Percentage of the proceeds of each future sale made by Seller ("Future Receipts"), including amounts due from Seller's credit card processor (hereafter " Processor"). "Future Receipts" includes all payments made by cash, check, ACH or other electronic transfer, credit card, debit card, bank card, charge card or other form of monetary payment in the ordinary course of Seller's business. As payment for the Amount Sold, Buyer will deliver to Seller the Purchase Price, shown above, minus any fees shown above. Seller acknowledges that it has no right to repurchase the Amount Sold from Buyer.

May 2019 Agreement, attached hereto as Exhibit A, at § 1. The standardized Square agreement, meanwhile, provides, *inter alia*:

> Merchant(s) hereby sell, assign, and transfer to SA (making SA the absolute owner) in consideration of the funds provided ("Purchase Price") specified above, all of each Merchant's future accounts, ontract[9] rights, and other obligations arising from or relating to the payment of monies from each Merchant's customers and/or other third party payors (the "Receivables", defined as all payments made by cash, check, credit or debit card, electronic transfer, or other form of monetary payment in the ordinary course of each merchant's business), for the payment of each Merchant's sale of goods or services until the amount specified above (the "Receivables Purchased Amount") has been delivered by Merchant(s) to SA. Each Merchant hereby acknowledges that until the Receivables Purchased Amount has been received in full by SA, each Merchant's Receivables, up to the balance of the Receivables Purchased Amount, are the property of SA and not the property of any Merchant. Each Merchant agrees that it is a fiduciary for SA and that each Merchant will hold Receivables in trust for SA in its capacity as a fiduciary for SA.

---

[9] [sic].

June 2022 Agreement, attached hereto as Exhibit E, at § 1.

The CFG agreement turns on the conveyance of an interest in "the proceeds of each future sale made by Seller," whereas the Square agreement hinges on the alienation of an interest in "all of each Merchant's future accounts, [c]ontract rights, and other obligations arising from or relating to the payment of monies." *Id.* What is being sold, in both instances, is not an already-existing— even if intangible—right to collect payment. Rather, the sale is of "rights to payment that do not exist at the time of the transaction and that may never exist." *Watchmen Sec. LLC*, 2024 Bankr. LEXIS 2871, at *11. Such is, as explained by the *Watchmen Sec. LLC* and *M Design Vill.* Courts, an utter impossibility.

J. Wellington Wimpy is certainly free to pay a dollar Tuesday for a hamburger today, *see In re Cook*, 322 B.R. 336, 339 n.5 (Bankr. N.D. Ohio 2005); such is a credit transaction (even if one upon which the obligor seems unusually likely to default). But neither Mr. Wimpy, nor the Debtor, nor anyone else can sell a hamburger Tuesday for a dollar today—outside the issuance of a security, as discussed below—for the simple reason that there may well never actually come to exist a hamburger on Tuesday. Such is not the sale of a choate asset; such is a speculative futures contract. Indeed, cattle futures are traded on the Chicago Mercantile Exchange.

### b. If the MCA Transactions are Sales, the Defendants Committed Securities Fraud

The only way the Debtor could have sold as-yet-nonexistent revenue rights to Square and CFG would have been through either (i) the issuance of an investment contract; or (ii) the sale of some variety of equity in the Debtor (whether a preferred membership interest or otherwise). Yet neither of these can be what the Defendants urge, because the purchase of a security requires a level of honesty and disclosure clearly absent from the MCA Transactions. *See* 17 C.F.R. § 240.10b-5.

Specifically, federal law proscribes, "in connection with the purchase or sale of any security," the making of "any untrue statement of a material fact," as well as the omission of the statement of "a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." *Id. See also Lorenzo v. SEC*, 587 U.S. 71, 78 (2019) ("After examining the relevant language, precedent, and purpose, we conclude that (assuming other here-irrelevant legal requirements are met) dissemination of false or misleading statements with intent to defraud can fall within the scope of subsections (a) and (c) of Rule 10b-5, as well as the relevant statutory provisions. In our view, that is so even if the disseminator did not "make" the statements and consequently falls outside subsection (b) of the Rule.").

Investment contracts and options contracts are securities. *See* 15 U.S.C. § 77b; 15 U.S.C. § 78c(a)(10). The same holds true for a contract conveying equity in a legal entity or a right to participate in the profits thereof. *Id. See also SEC v. W. J. Howey Co.*, 328 U.S. 293, 298-99 (1946) (". . . an investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party, it being immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interests in the physical assets employed in the enterprise.").

Notwithstanding that options contracts and investment contracts are securities under *Howey*, the MCA Agreements all purport to be sales of receivables—not sales of investment contracts or preferred equity in the Debtor. And, if the Defendants were to accordingly assert that the MCA Agreements are true sales (as opposed to loans), they would thusly find themselves defending the very form of the agreements they drafted for the Debtor's signature. Such would

require the Defendants positing that what was framed as a sale of receivables (a legal impossibility, per *Watchmen Sec. LLC* and its progeny) was actually the sale of a regulated security. And the failure of the Defendants to acknowledge such, in the two sets of substantively-identical agreements, would, in turn, mean the Defendants had therein omitted "a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5.[10]

Stated otherwise, since the MCA Transactions legally could not have been purchases of future receivables, the Defendants either (i) made usurious loans, avoidable for the reasons discussed *passim*; or (ii) engaged in securities fraud. The latter scenario would invite recourse under a private cause of action far more onerous than the relief sought in the instant case. *See, e.g., Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 196 (1976) ("Although § 10 (b) does not by its terms create an express civil remedy for its violation, and there is no indication that Congress, or the Commission when adopting Rule 10b-5, contemplated such a remedy, the existence of a private cause of action for violations of the statute and the Rule is now well established.") (citing *Blue Chip Stamps* v. *Manor Drug Stores,* 421 U.S. 723, 730 (1975); *Affiliated Ute Citizens* v. *United States,* 406 U.S. 128, 150-154 (1972); *Superintendent of Insurance* v. *Bankers Life & Cas. Co.,* 404 U.S. 6, 13 n. 9 (1971)); *Diaz Vicente v. Obenauer*, 736 F. Supp. 679, 696 (E.D. Va. 1990) (noting that while a claim under Rule 10b-5 does not invite punitive damages unto itself, corollary provisions of state law allow for such).

Given the strength of case law demonstrating the transactions to have been loans and not sales, the Trustee is confident this Honorable Court is unlikely to find *bona fide* sales to have

---

[10] Such is not to mention the myriad registration and/or exemption issues that would need to be navigated under the Securities Act of 1933, the Securities Exchange Act of 1934, and 50 sets of state "blue sky" laws.

occurred. However, to the extent such a finding is made, the Trustee asks—in addition to the avoidance relief sought in the respective complaints and expounded upon below—that (i) this motion be treated as one for partial summary judgment; (ii) leave to amend be afforded; and (iii) the Trustee be permitted to bring additional claims, against both Defendants and their respective insiders and agents, for securities fraud.

## VII.   Argument: Each MCA Transaction is Avoidable

Ultimately, there are only two possibilities: the MCA Agreements are either disguised loans or true sales. Under either eventuality, each transaction constitutes a fraudulent conveyance—under both the Bankruptcy Code and District of Columbia law—and should be avoided as such.

Familiarly, the Bankruptcy Code allows for the avoidance of any transaction devoid of reasonably equivalent value, 11 U.S.C. § 548(a)(1)(B)(i), if undertaken when a debtor either (i) "was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation," 11 U.S.C. § 548(a)(1)(B)(ii)(I), or (ii) "was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital," 11 U.S.C. § 548(a)(1)(B)(ii)(II).

District of Columbia law, meanwhile, similarly provides for the avoidance of any transaction made for less than reasonably equivalent value, D.C. Code § 28-3104(a)(2), if a debtor (i) "[w]as engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction," D.C. Code § 28-3104(a)(2)(A), or (ii) "[i]ntended to incur, or believed or reasonably should have believed

35

that the debtor would incur, debts beyond the debtor's ability to pay as they became due," D.C.

Code § 28-3104(a)(2)(B). Moreover:

> A transfer made, or obligation incurred, by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

D.C. Code § 28-3105(a).

The Trustee has the right to assert claims under District of Columbia law, on behalf of creditors. 11 U.S.C. § 544. As noted in the expert reports appended hereto, Industrial Bank was a creditor of the Debtor at all times relevant, *see* Berret Square Report, attached hereto as Exhibit K, at § IV(A)(1); Berret CFG Report, attached hereto as Exhibit R, at § IV(A)(1). To the extent not already accomplished by section 544, Industrial Bank has also assigned its litigation rights—against the Defendants—to the Trustee. So the provisions of both foregoing District of Columbia statutes are available to the Trustee.

The first criterion of the three statutes—an absence of reasonably equivalent value—has been set forth *passim*. As noted above, usurious loans are void and thusly necessarily incapable of creating reasonably equivalent value. *See, supra*, § V. Moreover, such is inherent in the very notion of usury itself: a loan on terms in excess of those permitted by law is, by definition, a loan on terms that are not reasonably equivalent in nature.

However, even if the transactions were deemed sales and not loans, there remains an absence of reasonably equivalent value. As noted in the expert reports of Ms. Berret, a comparison of value exchanged, coupled with cost-of-debt analysis and an exploration of the MCA Transaction terms themselves, invites—in connection with each transaction—the finding that "the Debtor did

36

not receive reasonably equivalent value. . ." Berret Square Report, attached hereto as Exhibit K, at § V; Berret CFG Report, attached hereto as Exhibit R, at § V.

The Debtor's solvency, and inability to pay debts as they come due, is also covered by Ms. Berret's reports. Therein, the Trustee's expert analyzes the Debtor's various monetary obligations and cash flow constraints at critical junctures, noting the extraordinary negative cash outflows plaguing the Debtor at all times relevant. *Id.* at § IV (being the same section of both reports). The Debtor's bankruptcy schedules show liabilities exceeding assets by more than $12 million, *id.* at § IV(B)(3), while the Debtor was burdened—pre-petition—by (i) a line of credit with Industrial Bank, (ii) a term loan from Industrial Bank; (iii) a second line of credit from Industrial Bank; (iv) obligations to other merchant cash advance entities; (v) automobile loans; (vi) credit card debts; and (vii) other monetary obligations, *id.* at § IV(A). This was, quite plainly, an entity that was both insolvent from a balance sheet perspective and utterly incapable of paying its debts as they came due.[11]

Notably, the Defendants have not designated their own expert witness in these cases (either directly or as a rebuttal designation). Thusly, the only expert testimony in the record—on the questions of reasonably equivalent value and solvency—is that of Ms. Berret. Her reports are both clear and compelling. That they are, too, unrebutted and unrefuted speaks volumes not just to the excellence of Ms. Berret's work but, too, to the wholesale lack of reasonable dispute on these

---

[11] Such is, to some degree, self-evident: an entity already engaged in banking relationships, such as the Debtor, would seemingly never be inclined to seek monies from a merchant cash advance company unless the entity was already incurring liabilities that could not be readily repaid and thusly ineligible to borrow additional monies from a bank. Debtors without access to traditional banking relationships may pose theoretically unique circumstances, especially in pockets of America where banking institutions are few and far apart. But the Debtor in this case was not only operating in a major international city but, too, already in a sophisticated relationship with Industrial Bank. It is rationally antithetical to surmise the Debtor was not utterly without any ability to pay its debts as they came due, by the time the Debtor turned to the Defendants for cash.

fronts. *See, e.g., In re Full Spectrum Mgmt., LLC*, 621 B.R. 421, 431-32 (Bankr. W.D. Mich. 2020) (noting the need of an expert witness "to determine whether the Debtor received reasonably equivalent value and to establish insolvency"); *Blackburn v. United States*, 2020 U.S. Dist. LEXIS 167998, at *25 (D. Utah July 14, 2020) (expert discovery needed to ascertain reasonably equivalent value); *In re Covenant Partners, L.P.*, 541 B.R. 804, 809 (Bankr. E.D. Pa. 2015) (expert testimony needed on question of reasonably equivalent value) (citing *In re Colonial Realty, Inc.*, 226 B.R. 513 (Bankr. D. Conn. 1998)).

## VIII.   Summary Judgment is Also Appropriate on the Claims for Unjust Enrichment

The Defendants—under the color of authority of a series of poorly-disguised loan agreements that frequently feature interest rates well in excess of 100% per annum—took millions upon millions of dollars from the Debtor. In so doing, the Defendants acted as a criminal syndicate, offending the usury laws of the very state whose laws they elected to govern the MCA Agreements. The mind accordingly need not wander far to appreciate why retention of such monies is innately and equitably unjust.

Under District of Columbia law, "[t]he elements of a claim for unjust enrichment are '(1) the plaintiff conferred a benefit on the defendant; (2) the defendant retains the benefit; and (3) under the circumstances, the defendant's retention of the benefit is unjust.'" *In re Berry*, 2023 Bankr. LEXIS 2602, at *31 n.18 (Bankr. D.D.C. Oct. 23, 2023) (quoting *News World Comms., Inc. v. Thompson*, 878 A.2d 1218, 1222 (D.C. 2005)). *Accord Gregorio v. Hoover*, 238 F. Supp. 3d 37, 52 (D.D.C. 2017) (citing *Falconi-Sachs v. LPF Senate Square, LLC*, 142 A.3d 550, 556 (D.C. 2016)).

Here, the Debtor paid CFG the sum of $5,058,947.00 and paid Square the sum of $1,156,357.86. Such payments certainly qualify as a "benefit" for purposes of assessing an unjust

38

enrichment claim. *See Ronaldson v. Nat'l Ass'n of Home Builders*, 502 F. Supp. 3d 290, 301 (D.D.C. 2020) (noting a monetary benefit to satisfy the "benefit" prong of a claim for unjust enrichment).

Similarly, the Defendants have retained this money. There is no contention in the record that the Defendants rejected payments from the Debtor; to the contrary, the record reflects that the Defendants did all they could to continue collect monies from the Debtor.

As to the third prong: retention of the money is unjust. Under District of Columbia law, "[d]etermining whether the retention of funds is unjust 'requires a highly contextual balancing of all of the equities.'" *Matiella v. Murdock St. LLC*, 2025 U.S. Dist. LEXIS 256074, at *20 (D.D.C. Dec. 10, 2025) (quoting *Marsden v. District of Columbia*, 142 A.3d 525, 529 (D.C. 2016)).

Notably, where—as here—the benefit is conferred pursuant to a contract later established to be void, such is a foundation upon which to find retention of the benefit unjust. *See, e.g.*, *Matiella*, 2025 U.S. Dist. LEXIS 256074, at *23 ("Under D.C. law, then, it is a 'valid theory of unjust enrichment' that when a party confers a benefit on another under a mistaken impression that the benefit was required by a contract, the party who confers the benefit may be entitled to a return of the benefit, even if the purported contract has been found not to exist.") (citing *Glasgow v. Camanne Mgmt.*, 261 A.3d 208 (D.C. 2021)).

In this case, the contracts under which the Debtor tendered monies to the Defendants were—uniformly and without exception—usurious loan agreements that violated both the civil and criminal laws of the State of New York. *See, supra,* § V. So, the agreements are, themselves, instruments in furtherance of a legally repugnant scheme. And the unlawful nature of the underlying usury is, in turn, indicative of the inequity of the retention of monies by the perpetrators thereof. *See, e.g.*, *Matter of Nonhuman Rights Project, Inc. v. Breheny*, 197 N.E.3d 921, 957 (N.Y.

39

2022) ("The law, at its core, reflects normative judgments about the behaviors we want to allow, encourage, discourage or prohibit. In this way, the law reflects our society's values and aspirations. Criminal law, for example, delineates the conduct we deem most harmful and the penalties for engaging in those acts.").

Accordingly, while the Trustee respects that the third element of a claim for unjust enrichment "requires a highly contextual balancing of all of the equities," *Matiella*, 2025 U.S. Dist. LEXIS 256074, at *20, it is also difficult to appreciate what—if any—equities militate in favor of permitting the retention of monies obtained through rank criminality. The Defendants have every appearance of being little more than modern day loan sharks, peddling interest rates repugnant to the statutory scheme of their own hand-selected state and doing so under the fraudulent guise of "purchasing" receivables that do not actually exist. Such conduct is, no doubt, properly described by myriad terms; "equitable" is assuredly not one of them.

## IX.    Conclusion

WHEREFORE, the Trustee respectfully prays this Honorable Court (i) find each MCA Transaction with Square to be avoidable under both section 544 and 548 of title 11 of the United States Code; (ii) find each MCA Transaction with CFG to be avoidable under both section 544 and 548 of title 11 of the United States Code;  (iii) enter judgment, in favor of the Trustee, and against Square, in the sum of $1,156,357.86, pursuant to section 550 of title 11 of the United States Code; (iv) enter judgment, in favor of the Trustee, and against CFG, in the sum of $5,058,947.00, pursuant to section 550 of title 11 of the United States Code; (v) alternatively, find the Debtor's payments, under each MCA Transaction, to have unjustly enriched each of the Defendants and, upon said finding, enter judgment in favor of the Trustee, and against CFG, in the sum of $5,058,947.00, as well as in favor of the Trustee, and against Square, in the sum of $1,156,357.86;

40

(vi) conditionally, if this Honorable Court finds the MCA Transactions to be sales and not loans, grant the Trustee leave to file an amended pleading, treating this motion as one for partial summary judgment, so claims for securities fraud may be pursued; and (vii) afford such other and further relief as may be just and proper.

Respectfully submitted,

Dated: July 7, 2026

By: /s/ Maurice B. VerStandig
Maurice B. VerStandig, Esq.
Bar No. MD18071
The VerStandig Law Firm, LLC
9812 Falls Road, #114-160
Potomac, Maryland 20854
Phone: (301) 444-4600
Facsimile: (301) 444-4600
mac@mbvesq.com
*Special Counsel to Wendell Webster*
*In His Official Capacity as*
*Chapter 7 Trustee*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 7th day of July, 2026, a copy of the foregoing was served electronically upon filing via the ECF system.

/s/ Maurice B. VerStandig
Maurice B. VerStandig

41