Christopher A. Jones (Bar# VA030)
Whiteford Taylor & Preston L.L.P
3190 Fairview Park Drive, Suite 800
Falls Church, VA 22042
(703) 280-9263 (telephone)
Email: cajones@whitefordlaw.com

*Counsel for CFG Merchant Solutions, LLC*

Shanna M. Kaminski, Esq.
Kaminski Law, PLLC
*Court Admission Pending*
P.O. Box 247
Grass Lake, MI 49240
(248) 462-7111 (telephone)
Email: skaminski@kaminskilawpllc.com

## IN THE UNITED STATES BANKRUPCY COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 23-378-ELG |
| BROUGHTON CONSTRUCTION | ) | Chapter 7 |
| CO., LLC, | ) | |
| | ) | |
| _____ | ) | |
| | ) | |
| WENDALL WEBSTER, in his official | ) | |
| Capacity as chapter 7 trustee and assignee | ) | |
| of Industrial Bank and Nationwide | ) | |
| Mutual Insurance Company, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Pro. No. 25-10055-ELG |
| | ) | |
| CFG MERCHANT SOLUTIONS, LLC, | ) | |
| | ) | |
| Defendant | ) | |
| _____ | ) | |

### DEFENDANT CFG MERCHANT SOLUTIONS, LLC'S RESPONSE TO THE TRUSTEE'S MOTION FOR SUMMARY JUDGMENT

Defendant, CFG Merchant Solutions, LLC ("**CFG**"), by and through undersigned counsel,

for its Response to the Trustee's Motion for Summary Judgment, states as follows:

1

**INTRODUCTION**

Prepetition, CFG and the Debtor entered into a series of transactions (collectively, the "**Agreements**"), under which the Debtor sold a percentage of its future accounts receivable to CFG in exchange for immediate business capital.

After the Debtor filed for Chapter 7 bankruptcy relief in this Court on December 15, 2023, the Trustee initiated the above–captioned adversary proceeding asserting claims against CFG under 11 U.S.C. §§ 548 and under DC Code §§ 28–3104 and 28–3105 pursuant to 11 U.S.C. § 544 (Counts I through IV, referred to collectively as the "**Avoidance Claims**" in this Response). The Trustee also asserted a conversion claim (Count V) and an unjust enrichment claim (Count VI) under District of Columbia common law.

The Trustee now seeks summary judgment on all claims (except for the conversion claim)[1] based on the theory that the transactions are somehow usurious loans. The Court must deny the Trustee's Motion for Summary Judgment as to all claims because the Trustee is barred from asserting that the transactions are loans under applicable law. And, even if the Trustee could somehow assert usury in contravention of settled state law, there are several issues of material fact regarding the nature of the transactions that prevent the Court from granting summary judgment, as CFG will demonstrate in this Response.

The Trustee further contends that, even if the transactions are not recharacterized as loans, he is entitled to summary judgment on the Avoidance Claims based on the absence of reasonably equivalent value. However, the determination of what constitutes reasonably equivalent value is a fact–intensive determination that is best left for trial, as demonstrated by the fact that there are

---

[1] Though the Trustee's Motion for Summary Judgment is not labeled as "partial," the Trustee does not address or mention the conversion claim at all in his Motion. Based on the Motion for Summary Judgment, the Trustee is not seeking summary judgment on the conversion claim. Accordingly, CFG does not address the conversion claim in this Response.

genuine issues of material fact as to whether the transactions provided reasonably equivalent value to the Debtor.

As such, the Court must deny the Trustee's Motion for Summary Judgment as to all claims.

<u>**SUMMARY JUDGMENT STANDARD**</u>

A motion for summary judgment brought pursuant to Federal Rule of Civil Procedure 56 is made applicable to an adversary proceeding pursuant to Federal Rule of Bankruptcy Procedure 7056. The Court cannot grant summary judgment unless "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if its resolution might affect the outcome of the case under governing law, and a dispute is "genuine" if the evidence is such that a reasonable factfinder could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (U.S. 1986). The substantive law determines which facts are material, and the court should only consider "facts that might affect the outcome of the suit under the governing law [that] will preclude the entry of summary judgment." *Id.*

Under the burden–shifting framework established by the Supreme Court in *Celotex Corp. v. Catrett*, the party moving for summary judgment bears the initial burden of demonstrating the absence of a genuine dispute of material fact. 477 U.S. 317, 323 (1986). Once that burden is met, the nonmoving party must come forward with specific facts demonstrating that a genuine issue exists for trial. *Id.* In evaluating a motion for summary judgment, the court must view the evidence and draw all reasonable inferences in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. 242 at 255; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 578, 588 (1986) (citation omitted). It is not for the judge "to weigh the evidence and to determine the truth

of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. 242 at 249.

**STATEMENT OF MATERIAL FACTS**

In addition to the evidence in the record, this Statement of Material Fact is based on the Elder Declaration, attached hereto as **Exhibit A**, which is fully incorporated by reference herein.

1.      Between May 2019 and January 2023, the Debtor entered into fourteen (14) Purchase Agreements ("**Agreements**") with CFG, under which the Debtor sold, assigned, and transferred to CFG a certain amount ("**Amount Sold**") of its Receipts, defined in the Agreements as "the proceeds of each future sale" made by the Debtor, including "all payments made by cash, check, ACH or other electronic transfer, credit card, debit card, bank card, charge card or other form of monetary payment in the ordinary course of Seller's business." *See* Agreements, attached hereto as **Exhibits B–K**, at page 1.

2.      Under each of the Agreements, the Debtor was to deliver the purchased Receipts to CFG by allowing CFG to debit a certain percentage ("**Purchased Percentage**"), specified in each Agreement, of the Debtor's Receipts from an account pre–approved by CFG ("**Designated Account**") daily. *See* Agreements, Exhibits B–K, at ¶ 2; Elder Declaration, Exhibit A, at ¶ 8.

3.      The Daily/Weekly Amount identified in each Agreement was meant to be an initial estimate of the Purchased Percentage of the Debtor daily Receipts based on historical revenue records provided to CFG by the Debtor during underwriting and was subject to reconciliation pursuant to Paragraph 8 of the Agreements. *See* Agreements, Exhibits B–K, at p. 1; Elder Declaration, Exhibit A, at ¶ 9.

4.      The Agreements did not provide for a fixed term within which the Debtor had to remit the purchased Receipts because the amount of time necessary to do so could vary based on

4

how many times the Daily/Weekly Amount was reconciled pursuant to Paragraph 8 of the May 2019 Agreement. *See* Agreements, Exhibits B–K, at ¶ 8; Elder Declaration, Exhibit A, at ¶¶ 7, 10.

5. CFG assumed the risk of non–collection of the Receipts and did not have recourse if the Debtor declared bankruptcy because declaring bankruptcy does not constitute a Default under the Agreements. *See* Agreements, Exhibits B–K, at ¶ 7, 13; Elder Declaration, Exhibit A, at ¶ 13.

6. Pursuant to the Agreements, CFG paid the Net Purchase Price, which amount equaled the Purchase Price less applicable fees and renewal amounts, to the Debtor shortly after execution of each Agreement. *See* Wire Confirmation Emails, attached hereto as **Exhibit L**; Elder Declaration, Exhibit A, at ¶ 16.

7. Apart from certain dollar amounts on Page 1 of the Agreements, all the Agreements contain the same terms, such that the remittance amount could be reconciled upon request by the Debtor, the agreement had an indefinite term, and CFG did not have recourse in bankruptcy. *See* Agreements, Exhibits B–K; Elder Declaration.

8. Prior to entering into each Agreement, CFG performed a thorough investigation of the Debtor, its revenue, and its customers to ensure that the Debtor had sufficient revenue to satisfy the obligations under each Agreement. *See* Masucci Declaration, attached hereto as **Exhibit M**. Specifically, CFG's underwriting department examined the Debtor's bank statements and accounts receivable reports, as well as the Debtor's obligations to other funders and/or lenders that were disclosed by the Debtor. *See* Due Diligence Documents, attached hereto as **Exhibit N**.

9.      While not all copies of the relevant agreements are in the parties' possession anymore,[2] CFG's books and records show that the Debtor entered into the following transactions with CFG:

| Agreement Date[3] | Purchase Price | Net Purchase Price | Purchased Percentage | Amount Sold | Receipts Remitted by the Debtor |
|---|---|---|---|---|---|
| 5/13/2019 | $75,000 | $71,721 | 10% | $108,000 | $48,977 |
| 7/26/2019 | $165,000 | $102,568 | 10% | $242,550 | $242,550 |
| 8/29/2019 | $100,000 | $98,201 | 10% | $147,000 | $147,000 |
| 1/28/2020 | $500,000 | $492,500 | 10% | $675,000 | $675,000 |
| 3/13/2020 | $150,000 | $148,025 | | $202,500 | $202,500 |
| 12/31/2020 | $450,000 | $445,500 | | $607,500 | $607,500 |
| 4/20/2021 | $250,000 | $248,500 | 10% | $337,500 | $337,500 |
| 7/9/2021 | $500,000 | $495,500 | 10% | $675,000 | $440,920 |
| 11/5/2021 | $300,000 | $297,000 | | $405,000 | $290,000 |
| 2/14/2022 | $500,000 | $262,000 | 10% | $700,000 | $600,000 |
| 4/6/2022 | $300,000 | $182,000 | 10% | $420,000 | $420,000 |
| 8/2/2022 | $605,000 | $501,421 | | $847,000 | $627,000 |
| 10/31/2022 | $300,000 | $296,821 | 15% | $420,000 | $167,000 |
| 1/18/2023 | $500,000 | $276,421 | 15% | $700,000 | $0 |

*See* Agreements, Exhibits B–K; Wire Confirmation Emails, Exhibit L; Summary of Agreements, attached hereto as **Exhibit O**; Transaction History, attached hereto as **Exhibit P**.

10.     From May 2019 to January 2023, CFG paid the Debtor a total of $3,918,178 pursuant to the various Agreements. *See* Summary of Agreements, Exhibit O; Wire Confirmation Emails, Exhibit L.

11.     During the same time period, the Debtor remitted a total of $4,178,947 to CFG, with the last remittance occurring on May 5, 2023. *See* Transaction History, Exhibit P.

---

[2] Neither party is in possession of copies of the March 2020 Agreement, the December 2020 Agreement, the November 2021 Agreement, and the August 2022 Agreement.

[3] Where a copy of the relevant agreement is not available, the table shows the date the Net Purchase Price was wired to the Debtor instead of the date the agreement was executed.

12.     The Debtor filed for Chapter 7 bankruptcy relief in this Court on December 15, 2023 ("**Petition Date**"), six (6) months after making its last Remittance to CFG under the October 2022 Agreement. *See id.*

13.     In consideration for the remittances made by the Debtor during the two (2) years prior to the Petition Date, CFG paid the Debtor a total of $2,311,163, broken down as follows:

- CFG paid the Debtor a Net Purchase Price of $495,500 under the July 9, 2021, transaction;

- CFG paid the Debtor a Net Purchase Price of $297,000 under the November 5, 2021, transaction;

- CFG paid the Debtor a Net Purchase Price of $262,000 under the February 15, 2022, transaction;

- CFG paid the Debtor a Net Purchase Price of $182,000 under the April 7, 2022, transaction;

- CFG paid the Debtor a Net Purchase Price of $501,421 under the August 2, 2022, transaction;

- CFG paid the Debtor a Net Purchase Price of $296,821 under the October 2022 Agreement;

- CFG paid the Debtor a Net Purchase Price of $276,421 under the January 2023 Agreement.

*See* Summary of Agreements, Exhibit O.

14.     In the two (2) years prior to the Petition Date, the Debtor remitted a total of $2,356,000, broken down as follows:

- The Debtor remitted a total of $252,000 of the $657,000 in Receipts purchased by CFG under the July 9, 2021, transaction;

- The Debtor remitted a total of $290,000 of the $405,000 in Receipts purchased by CFG under the November 5, 2021, transaction;

- The Debtor remitted a total of $600,000 of the $700,000 in Receipts purchased by CFG under the February 15, 2022, transaction;

- The Debtor remitted a total of $420,000 of the $420,000 in Receipts purchased by CFG under the April 7, 2022, transaction;

- The Debtor remitted a total of $627,000 of the $847,000 in Receipts purchased by CFG under the August 2, 2022, transaction;

- The Debtor remitted a total of $167,000 of the $420,000 in Receipts purchased by CFG under the October 2022 Agreement.

*See* Summary of Agreements, Exhibit O; Transaction History, Exhibit P, at pp. 13–19.

## **ARGUMENT**

### I.      **The Motion for Summary Judgment is Procedurally Improper and Prejudicial to CFG and Square Funding LLC**

As a threshold matter, the filing of the Motion for Summary Judgment by the Trustee is procedurally improper and prejudicial to CFG. The Trustee's Motion for Summary Judgment is identical to the motion for summary judgment the Trustee filed in the adversary proceeding against Square Funding LLC ("Square") [Adv. Case No. 25–10055–ELG, D.I. 14], inclusive of all exhibits relating to both CFG and Square. The Trustee is acting as if CFG and Square were joint defendants in the same adversary proceeding when they clearly are not. Not only is this procedurally improper, but it is also prejudicial to both CFG and Square.

Each adversary proceeding is meant to constitute a separate and distinct proceeding with its own independent record. *See In re KZK Livestock, Inc.*, 221 B.R. 471, 475 (Bankr. C.D. Ill. 1998). As such, the Court cannot consider evidence that relates to Square to adjudicate the Motion for Summary Judgment against CFG, and vice versa. *See id.* Though all exhibits are now public

record, the Trustee, in filing the same exact motions and exhibits in both adversary proceedings, is seeking to have the Court consider evidence from both cases simultaneously, as if evidence against Square was itself evidence against CFG and vice versa. This is prejudicial to both CFG and Square, as fact issues that might exist in one case might not exist in the other. CFG and Square are two distinct entities with distinct agreements, procedures, and trade secrets. Because of this, having the Court consider the Trustee's Motion for Summary Judgment as if CFG and Square were joint defendants in the same case creates the danger that CFG, Square, or both will be prejudiced.

As such, CFG submits that the Trustee's Motion for Summary Judgment is procedurally improper and that the Court should make independent findings based on the evidence presented by and against each defendant separately.

## II.   <u>The Court Cannot Grant Summary Judgment on the Trustee's Avoidance Claims</u>

Despite acknowledging that the nature of the transaction is irrelevant and does not affect the Avoidance Claims, the Trustee spends a significant amount of time arguing that the transactions are usurious loans. *See* Motion for Summary Judgment, p. 10 ("[T]he outcome of this case is *not* altered by a determination that the MCA Transactions are valid sales . . . .").

CFG agrees with the Trustee that the nature of the transactions is irrelevant to the adjudication of the Avoidance Claims. As a matter of fact, the Trustee pled the Avoidance Claims in the alternative, exploring both scenarios – on one hand, the scenario where the Court finds the Agreements to be loans and, on the other, the scenario where the Agreements are sales:

> ***If the MCA transactions are, in fact, actual sales of future receivables***, each such transaction (and every payment made thereupon) is a constructively fraudulent conveyance . . . . ***If the MCA transactions are not, in fact, actual sales of future receivables***, each such transaction is a poorly–disguised usurious loan that . . . is wholly invalid.

*See* Complaint, ¶¶ 3–4 (emphasis added)); *see also* Complaint, ¶¶ 23, 29, 34, 41; Motion for Summary Judgment, p. 10 (admitting that the nature of the transaction does not alter the result of the Avoidance Claims). The irrelevance of the nature of the transactions is further demonstrated by the fact that the Bankruptcy Court for the District of Maryland, in *In re Global Energy Services, LLC*, found the underlying agreement to be a sale yet allowed the trustee's avoidance claims to proceed, which undoubtedly shows that the nature of the transaction has no bearing in this case. No. 21–17305–NVA, 2025 WL 1012721, at *9 (Bankr. D. Md. Mar. 31, 2025).

Because of this, it is odd that the Trustee spent the bulk of his pages arguing that the transactions are usurious loan, while only cursorily arguing that the Debtor received less than reasonably equivalent value, which is arguably the most important element the Trustee must prove to obtain summary judgment on the Avoidance Claims. As demonstrated further in the following sections, the Trustee has not met his burden of showing that there are no issues of material fact as to the elements of the Avoidance Claims, precisely because the Trustee has failed to bring forth evidence showing that less than reasonably equivalent value was received by the Debtor as a result of the transactions with CFG. As such, despite the Trustee's creative arguments, the Court cannot grant summary judgment on the Avoidance Claims and should disregard the Trustee's recharacterization arguments.

But even if the nature of the transactions were somehow relevant (it is not), the Trustee is barred under New York law from asserting usury offensively on behalf of a corporation. And even if the Trustee could assert usury offensively (he cannot), the Court could not grant summary judgment on the Avoidance Claims because there are genuine issues of material fact as to the nature of the transaction.

As such, CFG respectfully requests that this Court deny the Motion for Summary Judgment as to the Avoidance Claims.

### A. Even if the Nature of the Transactions Were Relevant, the Trustee Is Barred from Asserting that the Transactions Are Usurious Loans Under New York Law

Putting aside the fact that the transactions are not loans to which usury laws are even applicable, it is well settled that under New York law a corporation may only assert usury as a defense to an action seeking repayment of a loan, not as an affirmative claim for relief. *See, e.g.*, *Paycation Travel, Inc. v. Glob. Merch. Cash, Inc.*, 141 N.Y.S.3d 319 (2d Dep't 2021) (reversing denial of summary judgment of usury based affirmative claim); *Adar Bays, LLC v. GeneSYS ID, Inc.*, 37 N.Y.3d 320, 179 N.E.3d 612 (2021) (reaffirming that usury is an affirmative defense to repayment on a note); *Streamlined Consultants, Inc. v. EBF Holdings LLC*, No. 21–CV–9528 (KMK), 2022 WL 4368114 (S.D.N.Y. Sept. 20, 2022) (holding that New York law prohibits a corporation from asserting usury as a basis for affirmative relief; usury may be raised only defensively in response to collection efforts).

Federal courts applying New York law routinely reject the idea that a corporation may invalidate a transaction by offensively asserting it is a usurious loan, reaffirming the well–settled principle that corporations are barred from asserting usury offensively under New York law. *See, e.g.*, *Ammirato v. Duraclean Int'l, Inc.*, 687 F. Supp. 2d 210, 220 (E.D.N.Y. 2010) (rejecting the argument that the loans were void as a matter of law because "the civil usury defense is unavailable" to corporations, which "may only assert criminal usury as a defense to repayment"); *Collins v. MCA Receivables, LLC*, 2024 WL 246111, at *5 (S.D.N.Y. Jan. 23, 2024) (dismissing a claim for declaratory judgment based on alleged usury); *Powercap Partners LLC v. Beaux Equities LLC,* 179 N.Y.S.3d 894 (Sup. Ct. 2023) (holding that the corporate defendant could "not bring an

11

action seeking a declaratory judgment that the subject loans violate criminal usury law"); *Streamlined Consultants, Inc. v. EBF Holdings LLC*, 2022 WL 4368114, at \*3 (S.D.N.Y. Sept. 20, 2022) ("Plaintiffs are barred from bringing affirmative claims for relief based on allegations of usury"); *Haymount Urgent Care PC v. GoFund Advance, LLC*, 609 F. Supp. 3d 237, 254 (S.D.N.Y. 2022) ("New York courts have uniformly . . . prohibited corporations from bringing affirmative claims or counterclaims alleging criminal usury and seeking to invalidate an agreement"); *Scantek Med., Inc. v. Sabella*, 582 F. Supp. 2d 472 (S.D.N.Y. 2008) (dismissing a claim for declaratory judgment based on alleged usury); *Tender Loving Care Homes, Inc v. Reliable Fast Cash, LLC*, 76 Misc. 3d 314, 320, 172 N.Y.S.3d 335, 341 (N.Y. Sup. Ct. 2022) ("Plaintiffs' cause of action seeking affirmative relief in the form of a declaratory judgment that the agreement is actually a disguised usurious loan must be dismissed as a matter of law…").

In the Complaint and in the Motion for Summary Judgment, the Trustee does precisely what controlling case law (and the New York usury statute) forbids: he invokes usury to seek affirmative relief on behalf of a corporation. Because such a theory is foreclosed as a matter of law, summary judgment cannot be granted on the basis that the transactions are, somehow, usurious loans.

### B. To the Extent that the Nature of the Transactions Is Relevant, There Are Genuine Issues of Material Fact That Prevent Summary Judgment

As previously mentioned, to the extent that the Trustee is allowed to pursue the usury theory offensively in contradiction to settled New York law, the Court cannot grant summary judgment on the Avoidance Claims because the contested nature of the transactions constitutes a genuine issue of material fact that prevents summary judgment as a matter of law.

In *In re Anadrill Directional Services Inc.*, the Bankruptcy Court for the Southern District of Texas came to the same conclusion at the summary judgment stage in a case similar to the one

at bar. No. 23–31199, 2026 WL 407859, at *1 (Bankr. S.D. Tex. Feb. 12, 2026). In that case, the chapter 7 trustee brought avoidance claims under 11 U.S.C. §§ 548 and 550 against a company that purchased accounts receivable from the debtor. As in this case, the trustee in *Anadrill* argued that the transaction was a usurious loan and thus void and unenforceable. *See id.* at *7. The court denied the trustee's motion for summary judgment because the nature of the transaction was highly contested, creating a genuine issue of material fact that prevented summary judgment as a matter of law. *See id.* at *6. In this respect, the court stated:

> [T]here remains a genuine dispute of material fact as to whether the Agreement is a usurious loan or sale of future receivables, because the parties dispute what the terms of reconciliation are, whether the Agreement specifies a finite term for repayment, and whether the Agreement requires Anadrill to make a weekly payment for a set dollar amount or for a percentage of the total amount Anadrill owes to RDM. Based on the summary judgment evidence before the Court, this Court cannot conclude that RDM failed to make a showing sufficient to establish the existence of an element essential to its case that the Agreement was a sale rather than a loan.

*Id.*

As in *Anadrill*, the Court is barred as a matter of law from granting the Trustee's Motion for Summary Judgment. As demonstrated at length below, the parties strongly disagree about the nature of the transactions and dispute all the essential terms of the Agreements. As such, the Trustee has failed to show that there are no issues of material fact and that summary judgment should be granted in his favor.

In fact, an analysis of the Agreements under applicable law clearly demonstrates that the transactions are sales. All the Agreements contain a choice of law provision designating New York law as the law governing the Agreements. *See* Agreements, Exhibits B–K, at ¶ 27; Motion for Summary Judgment, ¶¶ 6, 11. Under New York law, the existence of a loan is a prerequisite to the application of usury law, thus sales of receipts are not within the purview of New York's usury

statute. *See IBIS Capital Group, LLC v. Four Paws Orlando LLC*, No. 608586/16, 2017 WL 1065071, at *1 (N.Y. Sup. Ct. Mar. 10, 2017) (stating "where there is no loan there can be no usury"); *Seidel v. 18 E. 17th St. Owners, Inc.*, 79 N.Y.2d 735, 744 (1992) ("Usury laws apply only to loans or forbearances, not investments."); *Colonial Funding Network, Inc. for TVT Cap., LLC v. Epazz, Inc.*, 252 F. Supp. 3d 274, 280 (S.D.N.Y. 2017).

To determine whether a transaction is a loan subject to usury law or a sale of receipts, federal courts applying New York law examine the substance of the transaction to determine which party bore the risk of non–collection of the underlying receipts. *Lateral Recovery, LLC v. Cap. Merch. Servs., LLC*, 632 F.Supp.3d 402, 452 (S.D.N.Y. 2022) (stating that "the root of the analysis involves the question of whether the transaction involves a transfer of risk") (internal citations omitted).

To assess the transfer of risk, courts applying New York law utilize the three–factor test enunciated in *LG Funding, LLC v. United Senior Properties of Olathe, LLC*, which instructs courts to consider the following factors when determining whether a transaction is a sale or a loan: "(1) whether there is a reconciliation provision in the agreement; (2) whether the agreement has a finite term; and (3) whether there is any recourse should the merchant declare bankruptcy." 122 N.Y.S.3d at 312; *also see, e.g.*, *In re Glob. Energy Servs., LLC*, No. 21–17305–NVA, 2025 WL 1012721, at *4–5 (Bankr. D. Md. Mar. 31, 2025) (adopting the three–factor test for determining whether a transaction is a sale or a loan for purposes of applying New York usury law). While these factors are "neither exclusive nor decisive," they provide a clear roadmap for evaluating whether the business's obligations are truly contingent on its collection of receipts, as they would in a sale, or whether the funding company "is absolutely entitled to repayment under all circumstances," as it

14

would under a loan arrangement. *See LG Funding*, 122 N.Y.S. 3d at 312 (internal citations omitted).

As explained further in the following sections, the Agreements are all, in form and in substance, sales of receipts under New York law because CFG bore the risk of non–collection of Receipts and because the Debtor's obligation to remit any Receipts to CFG was completely contingent on the Debtor actually being operational and collecting Receipts. As such, there is a genuine issue as to the nature of the transaction and summary judgment must be denied.

### i. *Reconciliation Provision*

The first factor considers whether the agreement between the parties contains a reconciliation provision. *See LG Funding*, 122 N.Y.S. 3d at 312. Here, all the Agreements contain a *mandatory* reconciliation provision. *See* Agreements, Exhibits B–K, at ¶ 8. The reconciliation provision in the Agreements states, in its entirety, as follows:

> **Seller May Request Changes to the Daily Amount (IMPORTANT PROTECTION FOR SELLER):** The initial Daily Amount is intended to represent the specified Purchased Percentage of Seller's daily Future Receipts. For as long as no Event of Default has occurred, once each calendar month, Seller may request that Buyer adjust the Daily Amount to more closely reflect the Seller's actual Future Receipts times the specified Purchased Percentage. Seller agrees to provide Buyer any information requested by Buyer to assist in this reconciliation. Upon reasonable verification of such information, ***Buyer shall adjust the Daily Amount on a going–forward basis to more closely reflect the Seller's actual Future Receipts times the specified Purchased Percentage.*** Buyer will give Seller notice five business days prior to any such adjustment. After each adjustment made pursuant to this paragraph, the new dollar amount shall be deemed the Daily Amount until any subsequent adjustment.

*Id.* (emphasis added). Based on the plain language of Paragraph 8 of the Agreements, CFG was *required* to conduct a reconciliation if the documents provided by the Debtor showed that there had been a change in revenue such that the Daily Amount no longer aligned with the Purchased Percentage. *See id.* Courts routinely uphold reconciliation provisions with such mandatory

language as evidence of a sale. *See, e.g.*, *In re Glob. Energy Servs.*, 2025 WL 1012721, at *5 (finding a mandatory reconciliation provision stating the funding company "shall" reconcile the remittance amount to be evidence of a sale); *K9 Bytes*, 57 N.Y.S.3d at 632–33; *Colonial Funding Network*, 252 F. Supp. 3d at 281; *Streamlined Consultants, Inc. v. EBF Holdings LLC*, No. 21–CV–9528 (KMK), 22 WL 4368114, at *4 (S.D.N.Y. Sept. 20, 2022).

Importantly, CFG's reconciliation provision is not illusory because it **required** CFG to reconcile the Remittance (*i.e.*, CFG had no discretion) and it did not require the Debtor to provide overly onerous documentation to request a reconciliation. *See US Info. Grp. LLC v. EBF Holdings, LLC*, No. 22–CV–6661 (PKC), 2023 WL 6198803, at *3 (S.D.N.Y. Sept. 22, 2023) (finding reconciliation provision not illusory when there was mandatory reconciliation language).

Further, despite the Trustee's contentions, the fact that the Debtor could only request a reconciliation once a month does not make the reconciliation provision discretionary or illusory. In fact, in *Womack v. Cap. Stack, LLC*, the Bankruptcy Court for the Southern District of New York analyzed an agreement containing a virtually identical reconciliation provision (which also included the "once each calendar month" language) and held that it was a sale. No. 1:18–CV–04192 (ALC), 2019 WL 4142740, at *4–8 (S.D.N.Y. Aug. 30, 2019); *Compare* Agreements, Exhibits B–K, at ¶ 8 *with Womack*, 2019 WL 4142740, at footnote 3.[4]

---

[4] The agreement analyzed in *Womack*, as quoted by the court, contained a reconciliation provision stating as follows:

> Seller May Request Changes to the Daily Amount: The initial Daily Amount is intended to represent the Specified Percentage of Seller's daily Future Receipts. ***For as long as no Event of Default has occurred, once each calendar month, Seller may request that Buyer adjust the Daily Amount to more closely reflect the Seller's actual Future Receipts times the Specified Percentage***. Seller agrees to provide Buyer any information requested by Buyer to assist in this reconciliation.... After each adjustment made pursuant to this paragraph, the new dollar amount shall be deemed the Daily Amount until any subsequent adjustment.

2019 WL 4142740, at footnote 3 (emphasis added).

The reconciliation provision in the Agreements is also not illusory (particularly when the Agreements on their face show that CFG did not have discretion to deny a reconciliation) because there is no evidence in the record showing that the Debtor requested and was denied reconciliation by CFG. The Trustee devotes a substantial amount of time asserting in the Motion for Summary Judgment that the reconciliation provisions are illusory but does not allege any facts that would demonstrate the reconciliation provisions are illusory as a matter of law. The Debtor never requested a reconciliation at any time and, under New York law, a reconciliation provision cannot be challenged as illusory when the seller never requested and was denied a reconciliation. Elder Declaration, Exhibit A, at ¶ 10. *See, e.g.*, *Diesel Funding, LLC v. Build Retail, Inc.*, 248 A.D.3d 1190, 1192 (N.Y. App. Div. 2026) ("[W]e note that defendants did not seek to engage in the agreement's reconciliation procedure, which precludes our review of the claim that the process was illusory." (citing *Apollo Funding Co. v. Dave Reilly Constr., LLC*, 241 A.D.3d 1508, 1509, 242 N.Y.S.3d 86, 88 (2025)); *Pirs Cap., LLC v. D & M Truck, Tire & Trailer Repair Inc.*, 129 N.Y.S.3d 734, 739–40 (N.Y. Sup. Ct.), *judgment entered sub nom. Pirs Cap., LLC v. D&M Truck, Tire & Trailer Repair Inc.* (N.Y. Sup. Ct. 2020) (declining to find reconciliation provision illusory when the merchant did not allege that it ever requested a reconciliation); *In re JLK Constr., LLC*, No. 23–50034, 2025 WL 3681827, at *6 (Bankr. W.D. Mo. Dec. 18, 2025) (finding a reconciliation provision is not illusory when a reconciliation never occurred and there are no allegations one was requested and denied); *Streamlined Consultants, Inc. v. EBF Holdings, LLC*, No. 21–CV–9528 (KMK), 2023 WL 5835748, at footnote 4 (S.D.N.Y. Sept. 8, 2023); *Colonial Funding Network, Inc. for TVT Cap., LLC v. Epazz, Inc.*, 252 F. Supp. 3d 274, 286 (S.D.N.Y. 2017).

Because the Agreements contain a mandatory reconciliation provision, the first factor weighs in favor of the transactions being sales. As the trustee argues instead that the reconciliation

17

provisions are illusory, the practical application of the reconciliation provisions constitutes a genuine issue of material fact that prevents summary judgment in the Trustee's favor.

### ii.    *Finite Term*

The second factor considers whether the agreement has a finite term, which is indicative of a loan, or a variable term, which is indicative of a sale. *See LG Funding*, 122 N.Y.S. 3d at 312. Since the Agreements contain a genuine reconciliation provision, the Agreements necessarily have an indefinite term. *See In re Glob. Energy Servs.*, 2025 WL 1012721, at *6 (stating the finite term factor "goes hand–in–glove with the reconciliation provision factor"); *Principis Cap., LLC v. I Do, Inc.*, 201 A.D.3d 752, 754, 160 N.Y.S.3d 325, 327 (2022) ("[A]s the amount of the monthly payments could change, the term of the agreement was not finite."). The Bankruptcy Court for the District of Maryland explained the interplay between the presence of a reconciliation provision and the duration of an agreement for the sale of accounts, stating, "since the daily payment amount could be reconciled to more closely reflect [the seller's] actual receipts, and since those receipts depended on the generation of sales and payments from customers, the parties could not have known when the Agreement would terminate with full payment to [the buyer]." *In re Glob. Energy Servs.*, 2025 WL 1012721, at *6.

The same logic applies here: the duration of the Agreements was automatically indefinite because of the reconciliation mechanism provided for under Paragraph 8. *See* Agreements, Exhibits B–K, at ¶ 8. Thus, if the Debtor's revenue dropped, and the Debtor requested a reconciliation once a month (which it was entitled to do under the Agreements), the term of the Agreements would have been extended each time. *See id.* The natural fluctuation of the Debtor's revenue (*i.e.*, collection of Receipts), coupled with the mandatory reconciliation mechanism provided for under the Agreements, would have made it virtually impossible for the parties to

18

determine the exact duration of the Agreements on the dates the Agreements were executed. This demonstrates that the Agreements did not have a finite term, which is further evidence that the transactions were sales, not loans, thus creating another fact issue that prevents summary judgment in the Trustee's favor.

### iii.    *Recourse in Bankruptcy*

The last factor considers whether the buyer of the receipts has recourse against the seller if the seller declares bankruptcy. *See LG Funding*, 122 N.Y.S. 3d at 312. Courts have found agreements to be sales when the "declaration of bankruptcy does not constitute an event of default" under the terms of the agreement and when the agreement "does not contain any provisions establishing any recourse for [the funding company] should [the merchant] declare bankruptcy." *See Streamlined Consultants, Inc. v. EBF Holdings LLC*, No. 21–CV–9528 (KMK), 2022 WL 4368114, at *5 (S.D.N.Y. Sept. 20, 2022).

Here, Paragraph 13 of the Agreements defines what constitutes a Default under the Agreements. As is evident by that Paragraph, declaring bankruptcy does not constitute a Default under the Agreements. *See* Agreements, Exhibits B–K, at ¶ 13. The Agreements also state that if "***the Amount Sold is never remitted because Seller's business went bankrupt*** or otherwise ceased operations in the ordinary course of business, and Seller has not breached this Agreement, ***Seller would not owe anything to Buyer and would not be in breach of or default*** under the Agreement," further demonstrating that CFG does not have recourse in bankruptcy. *See* Agreements, Exhibits B–K, at ¶ 7 (emphasis added).

The Trustee makes a creative argument that, under the Agreements, "the mere formation of an *intent* to file for bankruptcy protection constitutes an event of default." Motion for Summary Judgment, p. 31. However, the Debtor's representation in Paragraph 4(t), stating that "Seller is not

*presently* intending to file bankruptcy in the foreseeable future," includes the "presently" limitation that does not appear in any other representation in that same paragraph, which leads to the obvious conclusion that forming an intent to declare bankruptcy during the course of the agreement is not an event of default. *See* Agreements, Exhibits B–K, at ¶ 4 (emphasis added). In contrast, most of the other representations and warranties include the word "shall," indicating that those are ongoing representations meant to survive for the entire duration of the agreements. *See id.*

Additionally, the Trustee argues that the fact that it is an event of default for the seller to sell its assets or business under the Agreements, without the ordinary course exception, shows that CFG had recourse against the seller. *See* Motion for Summary Judgment, p. 31; *See* Agreements, Exhibits B–K, at ¶ 4(k). As a threshold matter, the third factor in the analysis considers whether the buyer has recourse *in bankruptcy*, not whether the buyer has recourse in general, making the Trustee's argument irrelevant to the nature of the transaction. *See, e.g.*, *LG Funding*, 122 N.Y.S.3d at 312. Second, the covenant contained in Paragraph 4(k) of the Agreements, which prohibits the Debtor from selling its business or assets without prior approval by CFG, is actually an indication that the transactions are sales. This is because, in a sale transaction, the buyer owns the receipts it purchased from the seller. A sale of the seller's business necessarily implies the sale of the receipts owned by the buyer under the agreement, which, without adequate measures, would undermine the buyer's property rights.

Based on the foregoing, all three factors weigh in favor of the transactions being sales, not loans, which demonstrates that there are several issues of material fact that prevent a grant of summary judgment for the Trustee.

#### iv.      *New York Courts Routinely Find CFG's Agreements to Be Sales*

As further proof that the Agreements are sales, there are numerous opinions by New York state courts consistently finding CFG's agreements to be sales, not loans, under the three–factor test. *See, e.g.*, *CFG Merch. Sols., LLC v. Essential Foundations Preschool & Learning Center LLC*, No. 518812/2025, 2025 WL 2696095 (N.Y. Sup. Ct. Sep. 19, 2025) (finding CFG's agreement dated December 2024 to be a sale); *J.P.S Inn Inc. v. CFG Merch. Sols., LLC*, No. 816602/2025E, 2026 N.Y. Misc. LEXIS 452 (N.Y. Sup. Ct. Jan. 16, 2026) (finding CFG's agreement dated July 2023 to be a sale and stating that "the record belies any assertion that the [agreements] were loans…."); *CFG Merch. Sols., LLC v. L & D Café Inc.*, No. 005387/2025, 2025 N.Y. Misc. LEXIS 6496 (N.Y. Sup. Ct. Aug. 6, 2025) (finding CFG's agreement dated August 2024 to be a sale); *CFG Merch. Sols., LLC v. Dogs & Cats LLC*, No. E2025000645, 2025 N.Y. Misc. LEXIS 6381 (N.Y. Sup. Ct. July 28, 2025) (finding CFG's agreement dated November 2024 to be a sale); *CFG Merch. Sols., LLC v. 3 Heads Smoke Shop Inc.*, No. E2024020413, 2025 N.Y. Misc. LEXIS 5910 (N.Y. Sup. Ct. July 7, 2025) (finding CFG's agreement dated August 2024 to be a sale); *CFG Merch. Sols., LLC v. Ken Burns Sanitation Inc.*, No. E2024008062, 2025 N.Y. Misc. LEXIS 5833 (N.Y. Sup. Ct. July 1, 2025) (finding CFG's agreement dated September 2023 to be a sale); *CFG Merch. Sols., LLC v. Agla Rest. Corp.*, No. 622157/2024, 2025 N.Y. Misc. LEXIS 5517 (N.Y. Sup. Ct. June 13, 2025) (finding CFG's agreement dated May 2024 to be a sale); *CFG Merch. Sols., LLC v. Baker Constr. & Contracting LLC*, No. E2024013034, 2025 N.Y. Misc. LEXIS 4338 (N.Y. Sup. Ct. May 22, 2025) (finding CFG's agreement dated June 2024 to be a sale); *CFG Merch. Sols., LLC v. Carver*, No. E2024008062, 2025 N.Y. Misc. LEXIS 6658 (N.Y. Sup. Ct. Jan. 6, 2025) (finding CFG's agreement dated April 2024 to be a sale); *CFG Merch. Sols. LLC v. Kant Lose Logistics*, No. E2023009071, 2024 N.Y. Misc. LEXIS 338 (Sup. Ct. Jan. 24, 2024) (finding CFG's

21

agreement dated May 2023 to be a sale); *CFG Merch. Sols., LLC v. True Pwr. LLC*, 2024 NY Slip Op 33227(U) (N.Y. Sup. Ct. Sep. 16, 2024) (finding CFG's agreement dated November 2022 to be a sale); *CFG Merch. Sols., LLC v. Canyon Power Sols. LLC*, No. 531293/2021, 2022 N.Y. Misc. LEXIS 7318 (N.Y. Sup. Ct. Oct. 3, 2022) (finding CFG's agreement dated September 2021 to be a sale); *CFG Merch. Sols., LLC v. Fromley LLC*, No. 515056/2022, 2022 N.Y. Misc. LEXIS 7317 (N.Y. Sup. Ct. Oct. 13, 2022) (finding CFG's agreement dated April 2022 to be a sale). The above–cited opinions are attached hereto as **Exhibit Q**.

In all these cases, the courts found that CFG's agreements were sales because it was evident that the agreements did not give CFG a right to absolute repayment. The same considerations expressed in the cited opinions apply here, as language in the Agreements indicate that both CFG and the Debtor intended the Agreements to be sales at the time the Agreements were entered into.

The Trustee states, in a footnote, that CFG has prevailed in New York state courts relying "at least of date, on a different form of agreement than the one at issue *sub judice*, with the reconciliation provisions materially altered." Motion for Summary Judgment, p. 27, footnote 5. While it is true that CFG has since its last transaction with the Debtor slightly modified its reconciliation provision, a few of the decisions cited above considered agreements with the *same* reconciliation provision present in the Agreements at issue here and found those agreements to be sales. *See, e.g.*, *True Pwr. LLC*, 2024 NY Slip Op 33227(U), Exhibit Q, at pp. 51–55 (agreement attached hereto as **Exhibit R**); *Canyon Power Sols. LLC*, 2022 N.Y. MISC, LEXIS 7318, Exhibit Q, at pp. 56–58 (agreement attached hereto as **Exhibit S**); *Fromley LLC*, LEXIS 7317, Exhibit Q, at pp. 59–62 (agreement attached hereto as **Exhibit T**).

For these reasons, to the extent that the nature of the transaction is relevant to the claims asserted in this case, the Court should deny the Trustee's Motion for Summary Judgment because there are issues of material fact regarding the nature of the transactions.

### v.      *The Shoot the Moon Factors Are Not Relevant to the Usury Analysis*

In addition to the three (3) factors employed by New York courts when determining whether a transaction is subject to usury laws, the Trustee seeks to apply the factors used by the bankruptcy court for the District of Montana in *Cap Call, LLC v. Foster (In re Shoot the Moon, LLC)*, 635 B.R. 797 (Bankr. D. Mont. 2021). However, the *Shoot the Moon* factors are utilized to determine whether an agreement is a true sale or a secured financing, not to determine whether a transaction is a loan for the purpose of applying usury law. In fact, for example, the *Shoot the Moon* factors do not consider whether an agreement provides the buyer with an absolute right to repayment, which is the central question when determining whether an agreement is a sale or a usurious loan. *See, e.g.*, *Lateral Recovery*, 632 F.Supp.3d at 452.

As such, the *Shoot the Moon* factors are wholly inapplicable and irrelevant to the Avoidance Claims and should not be used to determine whether the Agreements are sales or loans. Nonetheless, even the application of the *Shoot the Moon* factors demonstrates that the transactions are true sales of receipts as most factors weigh in favor of this conclusion:

1.      **Recourse against the seller:** Under the Agreements, CFG does not have recourse against the seller if CFG cannot ultimately collect the purchased receipts because the seller's business slowed down or failed. *See* Agreements, Exhibits B–K, at ¶ 7. Certainly, CFG has recourse if the seller otherwise breaches the agreement, as is natural and common in all commercial transactions and cannot be a basis for recharacterizing the transactions as loans.

2.      **Servicing of accounts:** The Trustee is correct that the Agreements provide that the seller continues to service the accounts sold under the Agreements. However, this factor is not dispositive, on its own, to recharacterize the transaction as a loan.

3.      **Investigation by seller:** Prior to purchasing revenue from a company, it is CFG's standard procedure to analyze the prospective seller's bank account statements to determine the seller's revenue stream and its sources and ensure that the seller has sufficient revenue to sustain the obligations and to determine how to best help the seller and if a sale of accounts is the appropriate product for them. *See* Masucci Declaration, Exhibit M, at ¶¶ 4–10; Elder Declaration, Exhibit A, at ¶ 9. The transactions with the Debtor were no exception, as CFG conducted a thorough investigation into the Debtor's business and its revenue before entering into each Agreement. *See* Due Diligence Documents, Exhibit N. Specifically, CFG examined the Debtor's monthly bank statements, accounts receivables reports, and other obligations as disclosed by the Debtor. *See id.*; *see also* Masucci Declaration, Exhibit M.

4.      **Seller's right to excess collections:** To the extent that the Debtor collected more than expected in a day, CFG, not the Debtor, had a right to the excess for that day, which is indicative of a sale. This is because CFG purchased a percentage of the Debtor's receipts, which is necessarily a variable amount, not a fixed amount. *See* Agreements, Exhibits B–K, at p. 1.

5.      **Option to repurchase:** As admitted by the Trustee, under the Agreements the Debtor had no right to repurchase the accounts sold, which is indicative of a sale. *See* Agreements, Exhibits B–K, at ¶ 7; Motion for Summary Judgment, p. 33.

6.      **Buyer's ability to unilaterally alter pricing terms:** CFG had a right to unilaterally alter the pricing terms under the Agreements, which is evidence that the transactions are sales. This

is demonstrated by the fact that the Agreements provide CFG with the right to unilaterally request a reconciliation of the remittance amount. *See* Agreements, Exhibits B–K, at ¶ 9.

7.      **Seller's ability to compromise the terms of the assets:** The Debtor had no ability to compromise the terms of the assets other than the right to request a reconciliation, which is obviously indicative of a sale. In fact, the Debtor's only obligation under the Agreements was to remit the Purchased Percentage of Receipts as provided for under the Agreements, which is consistent with CFG holding property rights over the Receipts. *See* Agreements, Exhibits B–K.

8.      **Language of the agreement and conduct of the parties:** The language of the Agreements expressly states that the agreements are sales, not loans:

> Seller and buyer agree that the Purchase Price paid by Buyer in exchange for the dollar figure listed as the Amount Sold of Future Receipts . . . is for the purchase and sale of the Amount Sold of Future Receipts, is a true sale of receipts and is not intended to be, nor shall it be construed as, a loan or an assignment for security from Buyer to Seller.

*See* Agreements, Exhibits B–K, at ¶ 7. Further, contrary to the Trustee's assertions, the emails quoted in the Motion for Summary Judgment do not show that CFG treated the transactions as loans. *See* Motion for Summary Judgment, 33–34. In fact, if CFG knew that the Debtor was still operating and generating sufficient Receipts to continue remitting the Purchased Percentage (it was), the Debtor had no right to negotiate the amount and/or the frequency of the remittance because CFG is the rightful owner of the Receipts. *See* Masucci Declaration, Exhibit M, at ¶¶ 10–12.

On balance, even though the *Shoot the Moon* factors are designed to address a different situation and are irrelevant to the resolution of the issues of this case, most of the factors still weigh in favor of the Agreements being sales.

**C.      Regardless of the Nature of the Transactions, There Are Issues of Material Fact Regarding Whether the Debtor Received Less than Reasonably Equivalent Value**

Regardless of the nature of the transaction, the Trustee has the burden of presenting sufficient evidence to demonstrate that there are no issues of material fact preventing summary judgment in his favor. With respect to the Avoidance Claims, the Trustee has not presented sufficient evidence to show that the Debtor received less than reasonably equivalent value and has thus failed to meet his burden, preventing summary judgment as a matter of law.

**i.      *The Usurious Loan Theory Is Not a Basis for Finding an Absence of Reasonably Equivalent Value***

The Trustee's main argument in support of the assertion that the Debtor received less than reasonably equivalent value rests on the notion that the Agreements are usurious loans. *See* Motion for Summary Judgment, pp. 35–38. However, as previously explained, the Trustee cannot assert usury offensively and the transactions are not usurious loans under applicable law. As such, there can be no absence of reasonably equivalent value on the basis that the transactions are, somehow, usurious loans. What's more, even if the Trustee could assert that the transactions are usurious loans (he cannot do so affirmatively under New York law), this does not translate into a finding that the Debtor received less than reasonably equivalent value because, under New York law, the sole remedy for usury "is to have the loan declared void in future enforcement actions brought by the lender," and no such action has been brought by CFG against the Debtor. *In re Hill*, 589 B.R. 614, 622 (Bankr. N.D. Ill. 2018) (citing *DLJ Mortgage Capital, Inc. v. Smith*, 2007 N.Y. Slip Op. 32745(U) ¶ 3, 2007 WL 2814513 (N.Y. Sup. Ct. 2007)).

Additionally, it is important to note that even if the transaction was a loan and deemed to be usurious, New York law does not provide for a mechanism for recovery of any principal or interest already paid. *See, e.g., Adar Bays, LLC v. GeneSYS ID, Inc.,* 37 N.Y.3d 320, 326, 179

N.E.3d 612, 616 (2021) (A finding the transaction is a usurious loan simply "result[s] in the uncollectability of both principal and interest."). This is because, again, a corporate defendant can only raise usury as an affirmative defense. The Trustee is improperly seeking to use usury as a sword rather than as a shield in this action.

### ii.      *Sales of Accounts Receivables Are Not Legal Impossibilities*

The Trustee further argues that the transactions did not provide the Debtor with reasonably equivalent value because sales of receipts are legal impossibilities as future receipts cannot be sold. *See* Motion for Summary Judgment, pp. 38–44. Nevertheless, this argument has no weight as there is vast authority that disagrees with the Trustee's proposition. Critically, sales of accounts are expressly recognized under the Uniform Commercial Code ("UCC"), which defines "account" as "a right to payment of a monetary obligation." UCC §§ 9–109(a)(3), 9–102(a)(2). UCC § 9–204(a) further states that a party can acquire a security interest in "after–acquired collateral," or property that does not exist yet at the time of the agreement, demonstrating that future Receivables are assignable as property. Moreover, sales of accounts are recognized by New York state courts, as demonstrated by all the cited opinions in which the courts found CFG's agreements to be sales, and by federal courts. *See, e.g.*, New York Opinions, Exhibit Q; *Lateral Recovery*, 632 F. Supp. 3d at 458 ("The Form Three agreements, by contrast, are agreements for the purchase of receivables when viewed in their totality."). Lastly, the parties clearly did not intend the transactions to be loans or purchases of securities, as evidenced by Paragraph 7 of the Agreements, which expressly states that the agreement constitutes "a true sale of receipts and is not intended to be, nor shall it be construed as, a loan or an assignment for security." *See* Agreements, Exhibits B–K, at ¶ 7.

In light of the foregoing, the theoretical arguments advanced by the Trustee do not address the crux of the Avoidance Claims, namely whether the transactions provided the Debtor with

27

reasonably equivalent value. The reasonably equivalent value inquiry does not consider whether a transaction is a sale, a loan, or something else entirely; instead, it is an intensive factual inquiry that compares, as of the date that each obligation was incurred by the Debtor, the value of what the Debtor transferred to the value that the Debtor received in exchange. *See In re Greater Se. Cmty. Hosp. Corp. I*, No. 02–02250, 2008 WL 2037592, at \*7 (Bankr. D.D.C. May 12, 2008) (stating that the crux of the analysis is "the fair market value of the consideration received in exchange for the transfer"). In addition to numerical comparisons, courts also look at "the existence of an arm's–length relationship between the debtor and the transferee and good faith on the part of the transferee." *Id.* The Trustee has not addressed any of these issues, failing to meet his burden of proof as to the Avoidance Claims.

### iii.    *The Court Cannot Grant Leave to Amend the Complaint Because the Trustee's Request is Procedurally Improper, Unduly Delayed, and Prejudicial to CFG*

The Trustee further suggests that, because sales of accounts receivable are purportedly legally impossible, CFG must have violated securities laws. Motion for Summary Judgment, p. 43. The Trustee even requests that leave to amend be afforded to bring additional claims for securities fraud should the Court not rule in his favor. Motion for Summary Judgment, pp. 43–44. However, the Trustee is barred from doing so for several reasons.

First, the Trustee's request is procedurally improper as a request to amend may not be made through a summary judgment motion — it must be made through a separate, written motion. *See, e.g.*, *Benoit v. U.S. Dep't of Agric.*, 608 F.3d 17, 21 (D.C. Cir. 2010) (stating a request for leave to amend "must be submitted in the form of a written motion," stating "with particularity the grounds for seeking the order and state the relief sought" (internal quotation marks omitted)); *Trudel v. SunTrust Bank*, 288 F. Supp. 3d 239, 256 (D.D.C. 2018) (stating a request for leave to amend must

28

be in the form of a written motion and that a complaint cannot be amended through a summary judgment brief).

Second, it would be highly prejudicial to CFG if the Trustee were allowed to amend the Complaint after discovery has been concluded and summary judgment fully briefed and resolved. The Trustee's should not be rewarded for his undue delay with an opportunity to amend the pleadings to include frivolous claims against CFG. *See, e.g.*, *Williamsburg Wax Museum, Inc. v. Historic Figures, Inc.*, 810 F.2d 243, 247 (D.C. Cir. 1987) (holding that denial of a request for leave to amend is proper "if the amendment would result in delay or undue prejudice to the opposing party"). In *Williamsburg Wax Museum*, the DC Circuit affirmed a denial of a request for leave to amend when the request was made after the parties conducted "extensive discovery" and after summary judgment had been resolved, and when the amendment would "raise an entirely new issue." *Id.* In *Unique Indus., Inc. v. 965207 Alberta Ltd.*, the plaintiff sought leave to amend to add a claim to the complaint at the close of discovery and after the parties submitted summary judgment papers. 764 F. Supp. 2d 191, 207–08 (D.D.C. 2011). The District of DC denied leave to amend, finding that the other parties would be prejudiced and that the plaintiff's delay in seeking leave to amend was undue. *Id.* at 208. As in those cases, the Trustee's improper request for leave to amend must be denied as it would be highly prejudicial for CFG to have to litigate and conduct additional discovery on an entire new claim when discovery is completed and the parties have already litigated the action through the summary judgment stage.

Lastly, an amendment of the Complaint to include claims for securities laws violations would be futile and a waste of the Court and the parties' time and resources. The Trustee's contention that CFG violated securities laws derives from the erroneous assertion that sales of account receivables are legal impossibilities. As already demonstrated, sales of accounts are

29

expressly recognized under the UCC and by ample case law, especially in the state of New York, where several courts have found CFG's own agreements to be sales. The Agreements cannot violate securities laws because, by their own terms, they are sales and not assignments of securities. *See* Agreements, Exhibits B–K, at ¶ 7 (stating the agreement is a "true sale of receipts and is not intended to be, nor shall it be construed as, a loan or an assignment for security"). As such, new claims would be frivolous, and the Trustee should not be permitted to amend the Complaint.

In light of the foregoing, the Court cannot grant the Trustee leave to amend the Complaint.

### iv.   *The Trustee Has Not Met His Burden of Demonstrating an Absence of Reasonably Equivalent Value*

After making lengthy theoretical arguments that are irrelevant to the case, the Trustee merely offers a report by Lauren P. Berret (the "**Berret Report**," attached to the Trustee's Motion for Summary Judgment as Exhibit R) in support of his argument that the Debtor received less than reasonably equivalent value. As a threshold matter, an expert cannot make a legal conclusion regarding whether reasonably equivalent value was received. That is a legal conclusion that belongs solely to this Court. *See United States v. Sutton*, 642 F. Supp. 3d 57, 66 (D.D.C. 2022) (stating that the Federal Rules of Evidence are "not intended to allow experts to offer opinions embodying legal conclusions"). Yet the main problem with the Berret Report is that it provides insufficient evidence regarding the reasonably equivalent value issue.

As it relates to Count I and Count IV of the Trustee's Complaint, 11 U.S.C. § 548 limits avoidance remedies to certain transfers or obligations "made or incurred on or within 2 years before the date of the filing of the petition." 11 U.S.C. § 548(a)(1). Based on the express language of § 548, the Trustee may only seek to avoid transfers made or obligations incurred in the two (2) years prior to the Petition Date, a period limited to the time between December 15, 2021, and December 15, 2023 ("**§ 548 Avoidance Period**"). Nevertheless, the Berret Report, which is the

*sole* evidence presented by the Trustee, only considers one (1) of the Agreements executed during the § 548 Avoidance Period, namely the October 2022 Agreement. *See* Berret Report, p. 7 (admitting that the report "focuses on the transactions specifically identified in the pleadings," which included the May 2019 Agreement, the July 2019 Agreement, the August 2019 Agreement, and the October 2022 Agreement). All the other findings made by Berret with respect to the 2019 Agreements have no bearing on the § 548 claims, and, as such, they cannot be considered by the Court.

Additionally, the Berret Report, at least in part, does not evaluate reasonably equivalent value as of the date the Agreements were executed because it looks at the transactions in hindsight. *See* Berret Report, pp. 22–23, 25–26, 29–30, 32–33. Further, the Berret Report does not consider whether the parties acted in good faith, whether negotiations were conducted at arm's length, or whether the Purchase Prices aligned with the market value of the Receivables purchased, which are all important factors in determining reasonably equivalent value. *See* Berret Report; *In re Greater Se. Cmty. Hosp. Corp. I*, No. 02–02250, 2008 WL 2037592, at *7 (Bankr. D.D.C. May 12, 2008) (stating that courts consider fair market value, the existence of an arm's–length relationship, and good faith); *In re Greater Se. Cmty. Hosp. Corp. I*, 2012 WL 589269, at *13. Because the Berret report is insufficient to demonstrate that there are no issues of material fact, the Trustee has failed to meet his burden as to the § 548 claims, preventing summary judgment as a matter of law.

The Trustee also seeks summary judgment on Count II and III, which are claims under DC Code §§ 28–3104 and 28–3105 brought pursuant to 11 U.S.C. § 544. To succeed on Count II, the Trustee must demonstrate that the transfers made or the obligations incurred are

> Fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
> . . .

31

(2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

(A) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(B) Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

DC Code § 28–3104(a).

Critically, the interplay between 11 U.S.C. § 544 and DC Code § 28–3109(2) provides that transfers made or obligations incurred more than four (4) years before the petition date may not be avoided under DC Code §§ 28–3104(a)(2) and 28–3105(a). In fact, 11 U.S.C. § 544(a) states that the trustee's avoiding powers are measured "as of the commencement of the case," while DC Code § 28–3109(2) provides that claims under DC Code §§ 28–3104(a)(2) and 28–3105(a) may not be brought more than four (4) years after the transfer was made or the obligation incurred. As such, the Trustee may not avoid any transfers made or obligations incurred before December 15, 2019, which date marks four (4) years before the Petition Date.

While the Trustee's Complaint only sought to avoid transfers made after January 8, 2021, the Trustee is now seeking to avoid *all* transactions, including transfers made and obligations incurred before December 15, 2019. *Compare* Complaint, ¶¶ 30, 36, *with* Motion for Summary Judgment, pp. 49–50. The Trustee has not amended the Complaint at any time to include the unpled transfers, nor has he sought leave of Court to do so. Fed. R. Bankr. P. 7015; Fed. R. Civ. P. 15. Thus, the Trustee's Complaint does not support the relief requested by the Trustee in the Motion for Summary Judgment, failing to provide CFG adequate notice of the claims against it under Federal Rule of Civil Procedure 8, made applicable to this proceeding by Federal Rule of Bankruptcy Procedure 7008. When a complaint identifies the challenged transfers, but the motion for summary judgment seeks to avoid additional transfers not pled therein, courts should refuse to

grant summary judgment on claims regarding the unpled transfers absent a formal amendment of the pleadings. *See Bash v. Textron Fin. Corp.*, 524 B.R. 745, 755 (N.D. Ohio 2015) (denying motion for summary judgment as to additional transfer not pled in the complaint, stating that the complaint did "not fairly plead avoidance with respect" to the unpled transfers). Thus, this Court must deny the Trustee's Motion for Summary Judgment with respect to the unpled transfers as a matter of law. But even if this Court allows the Trustee to seek avoidance of unpled transfers, the Trustee cannot, as a matter of law, avoid transfers made or obligations incurred more than four (4) years before the Petition Date. 11 U.S.C. § 544(a); DC Code § 28–3109(2).

Importantly, however, the Court cannot grant summary judgment on the state law avoidance claims to begin with because there are genuine issues of material fact regarding whether the Debtor received less than reasonably equivalent value. Again, the Berret Report only analyzes one of the Agreements relevant to the inquiry, regardless of whether the unpled transfers are or are not included in the equation: the October 2022 Agreement. The other Agreements analyzed in the Berret Report are outside the scope of DC Code §§ 28–3104(a)(2) and 28–3105(a). Berret Report, p. 7. As such, the Berret Report offers minimal "evidence" regarding whether reasonably equivalent value was received by the Debtor under the relevant Agreements. Additionally, before entering into each Agreement, CFG conducted a review of the Debtor's financial records to determine whether the Debtor could sustain the obligations under each Agreement. Elder Declaration, Exhibit A, at ¶ 15; Masucci Declaration, Exhibit M. Thus, any assertion that the Debtor did not have sufficient Receipts to sell and remit is false, creating a genuine issue of fact that prevents summary judgment.

Lastly, to obtain summary judgment on Count III, the Trustee must demonstrate that

A transfer made, or obligation incurred, by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if

33

the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

DC Code § 28–3105(a). Once again, the Trustee seeks to avoid transfers made between January 8, 2021 and April 27, 2023, but the Berret Report only analyzes the 2019 Agreements and the October 2022 Agreement. Complaint, ¶ 33, 36; Berret Report, ¶ 7. Also, the Trustee cannot claim that the Debtor was insolvent as of January 2021 because CFG ensured that the Debtor had sufficient revenue to sustain the obligations incurred past that date. Elder Declaration, Exhibit A, at ¶ 15; Masucci Declaration, Exhibit M. The Trustee also cannot claim that the Debtor became insolvent because of the Agreements because CFG provided the Debtor with immediate liquidity more than once throughout the years and the Debtor did not file for bankruptcy until December 2023, almost one (1) year after it made its last remittance to CFG. *See* Transaction History, Exhibit P; Masucci Declaration, Exhibit M, ¶¶ 9–12.

### v.    *The Transactions Provided the Debtor with Reasonably Equivalent Value*

Contrary to the Trustee's assertions, the circumstances clearly show that the Debtor received reasonably equivalent value because of its transactions with CFG as the Debtor received substantial cash infusions from CFG in exchange for which the Debtor had to remit a small percentage of Receipts. *See* Agreements, Exhibits B–K; Summary of Agreements, Exhibit O; Wire Confirmation Emails, Exhibit L.

The transactions are sales, meaning that the "transfers" at issue, or, rather, the "obligations," are the Debtor's assignments of its accounts receivable to CFG which occurred when CFG paid the Purchase Price to the Debtor under each Agreement. Because of this, the presence or absence of reasonably equivalent value must be evaluated at the time each transaction was entered into, without the benefit of hindsight. *See In re Greater Se. Cmty. Hosp.*, 2008 WL

2037592, at *7 (explaining that the reasonably equivalent value issue "must be evaluated as of the date of the transaction"); *Alberts v. HCA, Inc.*, 496 B.R. 1, 15 (D.D.C. 2013) ("Whether a transfer was for reasonably equivalent value must be determined as of the date of the transaction.").

Reasonably equivalent value is found when "the debtor has received value that is substantially comparable to the worth of the transferred property." *BFP v. Resol. Tr. Corp.*, 511 U.S. 531, 548 (1994). In this respect, this court has quoted Professor Jack F. Williams, stating:

> [I]t is hard to imagine the case where the parties acted in good faith, reaching a price through a willful sale at arm's length, and still conclude that the values exchanged shock the conscience. . . . . Therefore, *as long as the divergence from the actual fair market value arises in an arm's length transaction and is attributable to good faith negotiations, then the transfer price is within the range of acceptable consideration, that is, reasonably equivalent value* . . . . The functional approach to reasonably equivalent value recognizes that *the purpose of fraudulent transfer law is not to allow the debtor to re–trade a transaction struck in good faith and arrived at by arm's length negotiations. Such a transfer should not be a viable target of fraudulent transfer law.*

*In re Greater Se. Cmty. Hosp. Corp. I*, No. 02–02250, 2012 WL 589269, at *13 (Bankr. D.D.C. Feb. 22, 2012), *aff'd sub nom. Alberts v. HCA, Inc.*, 496 B.R. 1 (D.D.C. 2013) (quoting Jack F. Williams, *Revisiting the Proper Limits of Fraudulent Transfer Law*, 8 Bankr. Dev. J.55, 84–86 (1991) (emphasis added)).

Here, several factors should be considered in determining that the Debtor did indeed receive reasonably equivalent value. First, CFG entered into the transactions in good faith seeking to help the Debtor address imminent liquidity concerns and did so multiple times at the Debtor's request following several arm's length negotiations. Masucci Declaration, Exhibit M.

Second, in exchange for incurring the obligation to remit a percentage of its Receipts to CFG, the Debtor received from CFG a Purchase Price, which represented immediate and certain operating funds at a time when the Debtor needed them. A Debtor's need for the provided benefit

35

as of the date of the transaction may reasonably increase the cost of the transaction without necessarily translating into an absence of reasonably equivalent value.

Third, the difference between the Purchase Price and the Receipts purchased reflected, among other things, the risk that CFG was incurring by entering into the transactions (*i.e.*, the risk of non–collection). The cost of that risk was necessary to ensure that CFG could see the benefit of its bargain with the Debtor while still being able to provide the Debtor with the funds needed. Such cost was a result of a good–faith and arm's length negotiation and should be taken into account when determining reasonably equivalent value.

Lastly, by purchasing the Debtor's Receipts at a discount without imposing on the Debtor a duty of absolute repayment, CFG was likely instrumental in delaying the Debtor's insolvency by providing immediate operating capital to the Debtor at a time when the Debtor was either unable or unwilling to obtain traditional financing. All these factors should be considered when determining whether the Debtor received less than reasonably equivalent value.

The reasonably equivalent value determination requires an inherently factual inquiry that cannot be made without full factual development of the record. Given the lack of adequate evidence presented by the Trustee, who carries the initial burden of showing that summary judgment is appropriate, the Court cannot grant summary judgment on the Avoidance Claims.

### III.     Summary Judgment Is Not Appropriate on the Unjust Enrichment Claims

Lastly, the Trustee argues that summary judgment is appropriate on the unjust enrichment claim on the basis that the transactions were, again, usurious loans. *See* Motion for Summary Judgment, pp. 47–49. As fully demonstrated in the previous sections, the transactions are not loans, let alone usurious loans, under applicable law. What's more, the Trustee, again, is barred from asserting usury offensively as a basis of relief under New York law.

Throughout this Response, CFG has demonstrated that there are numerous issues of material fact that prevent the court from recharacterizing the transactions as loans at the summary judgment stage. Because the Trustee's unjust enrichment claim is wholly based on the erroneous assumption that the transactions are usurious loans, the Trustee has failed to bring forth sufficient evidence to prove an essential element of the claim: that CFG's retention of the "benefit" is "unjust." *See News World Commc'ns, Inc. v. Thompsen*, 878 A.2d 1218, 1222 (D.C. 2005) (listing the elements of an unjust enrichment claim under DC common law). In other words, because the transactions are sales of accounts, and because the Trustee is barred from asserting that the transactions are usurious loans, the Trustee has failed to provide *any* basis whatsoever to show that CFG's retention of the receipts remitted by the Debtor is unjust.

Under D.C. common law, the elements of an unjust enrichment claim are: "(1) the plaintiff conferred a benefit on the defendant; (2) the defendant retains the benefit; and (3) under the circumstances, the defendant's retention of the benefit is unjust." *Glasgow v. Camanne Mgmt. Inc.*, 261 A.3d 208, 219 (D.C. 2021) (quoting *News World Comms.*, 878 A.2d at 1222).

Here, the Trustee's Motion for Summary Judgment lacks the most basic element of an unjust enrichment claim: the Trustee has not demonstrated that the Debtor conferred a "benefit" to CFG. The Trustee merely states that the remittances made to CFG (described in the Motion for Summary Judgment as "payments") constitute a "benefit" because they were monetary payments. *See* Motion for Summary Judgment, pp. 47–48. However, in remitting the purchased Receipts, the Debtor did not "confer a benefit" to CFG; rather, the Debtor was delivering to CFG property that already belonged to CFG. *See* Agreements, Exhibits B–K, at ¶ 1 ("Seller agrees to sell to Buyer . . . the Amount Sold, by delivering the Purchased Percentage . . . ."). From the moment the Debtor received the Purchase Price from CFG, the Purchased Percentage of the Receipts was CFG's

property. As such, there cannot have been a transfer of a benefit by the Debtor to CFG because CFG owned the Receipts that the Trustee now seeks to identify as "benefit."

The elements of the unjust enrichment claim also require the Trustee to show that retention of the purported benefit by CFG is "unjust" because the benefit "in justice and equity belongs to another." *Falconi–Sachs v. LPF Senate Square, LLC*, 142 A.3d 550, 556 (D.C. 2016) (quoting *Jordan Keys & Jessamy, LLP v. St. Paul Fire & Marine Ins. Co.*, 870 A.2d 58, 63 (D.C. 2005)). Nevertheless, the Trustee cannot demonstrate that CFG's retention of the Receipts is unjust for the same reasons that the Trustee cannot demonstrate that the Debtor conferred a benefit to CFG: the remitted Receipts belong to CFG and are not property of the Debtor, thus CFG rightfully retains the Receipts because there can be no inequity in retaining one's own property.

Lastly, the unjust enrichment claim cannot stand as a matter of law because of the documented existence of express agreements which governed the conduct of the parties. *See* Agreements, Exhibits B–K. D.C. courts consistently hold that "there can be no claim for unjust enrichment when an express contract exists between the parties." *See, e.g.*, *Schiff v. Am. Ass'n of Retired Persons*, 697 A.2d 1193, 1194 (D.C. 1997). "[W]here the parties have a contract governing an aspect of the relation between themselves, a court will not displace the terms of that contract and impose some other duties not chosen by the parties." *Emerine v. Yancey*, 680 A.2d 1380, 1384 (D.C. 1996); *see also Wilderness Soc. v. Cohen*, 267 A.2d 820, 822 (D.C. 1970) (holding that the plaintiff could not recover via an unjust enrichment claim when the conduct of the parties "was expressly covered by the contract terms").

Here, the express terms of the Agreements governed the conduct of the parties, specifically the Debtor's remittance of the purchased Receipts. *See* Agreements, Exhibits B–K, at ¶ 2 (governing methods of remittance). Other than attempting to invalidate the Agreements by

38

recharacterizing them as usurious loans (a theory that New York law expressly prohibits), the Trustee has not presented sufficient facts to demonstrate that summary judgment is appropriate as to each element of the unjust enrichment claim. As such, the Trustee has failed to meet his burden, and summary judgment must be denied. Alternatively, to the extent that the Court finds that the Trustee has met his burden, the Court cannot grant summary judgment on the unjust enrichment claim because there are genuine issues of material fact regarding the nature of the transaction.

## CONCLUSION

There are several disputes of material fact that prevent this Court from granting summary judgment in favor of the Trustee.

First, the Trustee Motion for Summary Judgment is based on the erroneous assumption that the Agreements are usurious loans – an assumption that the Trustee actively admits is not even relevant to the fraudulent conveyance analysis.

Second, the Trustee has not demonstrated that the Debtor received less than reasonably equivalent value because of entering into the Agreements with CFG, which defeats the Avoidance Claims.

Third, the Trustee has not demonstrated that he is entitled to summary judgment on the unjust enrichment claim because the record shows that CFG did not receive a benefit nor that it was unjust for it to retain it.

As such, CFG respectfully requests that the Court deny the Trustee's Motion for Summary Judgment.

Dated: August 12, 2026

Respectfully Submitted,

CFG MERCHANT SOLUTIONS, LLC

*/s/ Christopher A. Jones*
Christopher A. Jones (Bar# VA030)
Whiteford Taylor & Preston L.L.P
3190 Fairview Park Drive, Suite 800
Falls Church, VA 22042
(703) 280-9263 (telephone)
Email: cajones@whitefordlaw.com

Shanna M. Kaminski, Esq.
Kaminski Law, PLLC
*Court Admission Pending*
P.O. Box 247
Grass Lake, MI 49240
(248) 462-7111 (telephone)
Email: skaminski@kaminskilawpllc.com

*Counsel for CFG Merchant Solutions, LLC*

## Certificate of Service

I hereby certify that on this 12th day of August, 2026, a copy of the foregoing *Response to the Trustee's Motion for Summary Judgment* was filed and served via the Court's Electronic Case Filing System on all parties receiving such notification.

<u>/s/ *Christopher A. Jones*</u>